UNITED STATES of America, Appellee,

v.

James Edward ANTWINE, Appellant.

No. 88–1889.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 16, 1988.

Decided May 3, 1989.

Lisa White Hardwick, Kansas City, Mo., for appellant.

Anita L. Mortimer, Asst. U.S. Atty., Kansas City, Mo., for appellee.

Before BOWMAN and MAGILL, Circuit Judges, and HANSON, Senior Circuit Judge.*

BOWMAN, Circuit Judge.

James E. Antwine appeals his convictions on conspiracy and bank larceny charges, contending that illegally seized evidence was admitted, that the jury verdict on one count was not unanimous, and that he was denied his right to a speedy trial. We affirm.

The charges against Antwine stem from the June 22, 1987 holdup of the Home Savings Association in Kansas City, Missouri. On that date, a man later identified as Sylvester McCoy, Jr. entered the bank and handed the teller, Joan Crawford, a bag and a note reading "I have a gun, give me all the money in the safe and drawer and don't· push anything." Crawford placed approximately $11,385.00 from her drawer and from a reserve box in the bank safe into the bag and handed it to McCoy, who then walked out and left in a waiting car.

McCoy turned himself in a few days later. In a statement provided to FBI agents on July 9, 1987, McCoy indicated that the "robbery" had been prearranged by Antwine, Crawford, and the security guard at the bank. McCoy claimed that Antwine had provided him with the note, bag, and a jacket and that Antwine had offered him the use of a pearl-handled handgun, which he had declined to take. FBI agents then re-interviewed Crawford. After she had provided them with further information implicating Antwine, nine FBI agents went to Antwine's house. Because the agents lacked a warrant, they devised a scheme to lure Antwine from his house so that they could arrest him. Two agents who were casually dressed decided to pose as members of a softball team. They knocked on the door, and Antwine answered in his shorts. After ascertaining his identity, the agents informed him that he had won a VCR in their softball team's raffle. Antwine apparently was suspicious, but went

___

* The HONORABLE WILLIAM C. HANSON, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

back inside to put on his pants and then returned to the door. After further conversation, Antwine drew a handgun and pointed it at the two agents, who still had not identified themselves. The agents backed off the porch, and Antwine closed the door.

At this point, Kansas City police officers began to arrive on the scene, both because the FBI had called for assistance and because a 911 call had been placed from inside the house. A public address system was set up outside the house, and the FBI announced their presence and that they had a warrant for Antwine's arrest.[1] About twenty minutes later, Antwine came outside and was arrested in his front yard.

Following the arrest, at least one police officer entered the house and conducted a "protective sweep" to determine if other persons were there. An eleven-year-old boy and a small girl were inside the house. Because they planned to leave the children home alone, Agent Moore of the FBI decided to retrieve the gun that Antwine had earlier brandished at the door. Agent Moore located the gun in a partially open drawer of a dresser in Antwine's bedroom, and seized it. No other items were taken from Antwine's house.

Antwine moved to suppress the gun retrieved by Agent Moore. A hearing on the motion was held before a United States Magistrate,[2] at which Agent Moore and other agents testified. Consistent with the magistrate's findings, the District Court[3] denied Antwine's motion. Following a jury trial, Antwine was convicted of conspiracy to commit bank larceny, for which he received a five-year suspended sentence, and bank larceny, for which he received a ten-year sentence. This appeal followed.

### I.

Antwine contends that the handgun seized by the FBI agent should not have been admitted at trial because it was the product of an illegal search. Antwine points to the fact that the agents had no warrant, and argues that there were no exigent circumstances to justify a warrantless search of his house. We disagree.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." This constitutional protection of the privacy of the home is manifested in the rule that "a search or seizure carried out on a suspect's premises without a warrant is *per se* unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.'" *Coolidge v. New Hampshire*, 403 U.S. 443, 474–75, 91 S.Ct. 2022, 2042–43, 29 L.Ed.2d 564 (1971). As the Supreme Court explained in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at 590, 100 S.Ct. at 1382.

In evaluating whether exigent circumstances were present in this case, we are guided by *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), in which the Supreme Court created a "public safety" exception to the rule that the product of a custodial interrogation not preceded by *Miranda* warnings is inadmissible. *See generally Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Quarles* involved a police inquiry of a rape suspect, who was known to be armed and whom they had captured inside a supermarket, as to the whereabouts of his gun. The Court ruled that the suspect's reply, and the gun itself, were admissible despite the fact that he had not received *Miranda* warnings prior to the inquiry. The Court noted that it had "long

---

1. The agents did not, in fact, have such a warrant.

2. The Honorable Calvin K. Hamilton, Chief United States Magistrate for the Western District of Missouri.

3. The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri.

recognized an exigent-circumstances exception to the warrant requirement in the Fourth Amendment context." *Quarles*, 467 U.S. at 653 n. 3, 104 S.Ct. at 2630 n. 3. The clear implication of *Quarles* is that a warrantless seizure of a weapon may be considered "reasonable" within the meaning of the Fourth Amendment when justified by an officer's legitimate concern for someone's safety. *See id.*

This reading of *Quarles* is in accord with our long-held view that legitimate concern for the safety of individuals may constitute "exigent circumstances" justifying warrantless entries and searches. *See, e.g., United States v. Hill*, 730 F.2d 1163, 1170 (8th Cir.) (entry into house justified by officer's observation of weapon through sliding glass door), *cert. denied sub nom. Frazier v. United States*, 469 U.S. 884, 105 S.Ct. 255, 83 L.Ed.2d 192 (1984); *United States v. Wells*, 702 F.2d 141, 144 (8th Cir.1983) (police officer justified in seizing paper bag with gun inside from floor of tavern to protect himself and other patrons); *United States v. Williams*, 633 F.2d 742, 744 (8th Cir.1980) ("When there is a reasonable fear of harm, a warrantless entry [into defendant's home to effect arrest] may be justified."). *See also Warden v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967) ("The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others.").

■We believe that the facts of this case justified Agent Moore's warrantless entry into Antwine's house and his subsequent seizure of the handgun. The Court below found that "Moore did a search, looking for the weapon that previously had been exhibited, so as to not leave the chil-

dren alone with the weapon. Moore believed he needed to obtain the weapon prior to leaving the children in the home. Moore did not believe that another course of action was available to him at that time.... Moore's sole purpose for recovery of the weapon at that time was the safety of the children." *United States v. Antwine*, Magistrate's Report at 8–9 (W.D.Mo. Jan. 4, 1988). We cannot say that those findings, which were accepted by the District Court, are clearly erroneous. *See United States v. Morgan*, 743 F.2d 1158, 1162 (6th Cir.1984) ("a district court's factual finding on the existence of exigent circumstances will not be disturbed unless clearly erroneous"), *cert. denied*, 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985).[4]

■ Moreover, the scope of Agent Moore's warrantless search did not exceed what was necessitated by the exigency. It is significant that Agent Moore did not look for the stolen money or for the items McCoy claimed had been provided by Antwine. Rather, Agent Moore simply located the gun and seized it. Under these circumstances, we hold that the warrantless seizure of the gun was not unreasonable. *See Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978) ("a warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant"). The gun therefore was properly admitted into evidence at trial.[5]

## II.

■ Antwine contends that his right to a unanimous verdict was violated because one juror expressed reservations about the verdict on Count I (the conspiracy count).

---

**4.** Antwine's reliance on *Morgan* is misplaced. Although the Sixth Circuit in that case concluded that exigent circumstances were lacking, the case did not involve, as this one does, the threat to the safety of unsupervised children posed by the presence of a loaded weapon in their home.

**5.** Antwine argues for the first time on appeal that the probative evidentiary value of the gun was far outweighed by its potential to unfairly prejudice the jury against him. *See* Fed.R.Evid.

403. Antwine's failure to object at trial on this ground to the introduction of the gun into evidence precludes his raising this argument on appeal. *See United States v. Meeks*, 857 F.2d 1201, 1203 (8th Cir.1988). In any event, we think that the gun was properly admitted into evidence under Rule 403. It provided an important link between McCoy's testimony and Antwine, and its probative value in that regard outweighed any danger of unfair prejudice.

The Sixth Amendment guarantees a federal criminal defendant's right to a unanimous verdict. *See Andres v. United States*, 333 U.S. 740, 748, 68 S.Ct. 880, 884, 92 L.Ed. 1055 (1948); *see also* Fed.R.Crim.P. 31(a). A valid verdict is " 'certain, unqualified and unambiguous considering the circumstances of [its] receipt and poll of the jurors....' " *United States v. Morris*, 612 F.2d 483, 490 (10th Cir.1979) (quoting *Cook v. United States*, 379 F.2d 966, 968 (5th Cir.1967)).

Following the jury's return of guilty verdicts on both counts, the Court requested that the clerk poll the jury. Juror Foy indicated that she agreed "with reservations" with the verdicts. At the conclusion of the polling, the Court further questioned Juror Foy:

THE COURT: There was a statement by one member of the jury that she has some reservations. It is not entirely clear what that might mean. Mrs. Foy, in following the instructions of the Court and in your determination of whether there was proof beyond a reasonable doubt as defined by the Court, do you agree as to Count I?

JUROR FOY: Right.

THE COURT: As to Count II, do you agree or disagree?

JUROR FOY: I agree to Count I with reservations. But to Count II I agreed.

Appendix at 54. After further discussion at the bench among the Court and the attorneys, the following exchange took place out of the hearing of the other jury members:

THE COURT: Ms. Foy, apparently there is something in your mind and I think maybe you want to express it, tell us something about your view of this or the prosecution. Do you want to make some comment, we will call it a comment?

JUROR FOY: I would just like to ask why Mr. Antwine's attorney did not object to anything that was said. Too many of the things that were said that would have made him not guilty or guilty. But for example, the jacket, he didn't object to the young man saying

that he gave him a jacket, the plastic bag. Those are the things, there wasn't enough substance there for me to really feel comfortable with.

*Id.* at 58–59. The Court declined to make further inquiry, and decided to accept both guilty verdicts. In a later order, the District Court indicated its view that both verdicts were unanimous. Designated Record (D.R.) at 67.

The constitutional requirement of a unanimous verdict was met in this case. Although Juror Foy agreed "with reservations" to the verdict on Count I, she responded affirmatively to the Court's inquiry as to whether there was proof beyond a reasonable doubt. When given an opportunity to explain her reservations, Juror Foy simply expressed dissatisfaction with the tactics of Antwine's attorney, apparently on the basis that she thought he should have objected to the admission of certain evidence that contributed to the proof of Antwine's guilt.[6] Her comments did not indicate that she disagreed with the verdict on Count I; on the contrary, each time she was asked she indicated that she *agreed* with the verdict, subject to the reservation she expressed. The record establishes that the District Court fulfilled its duty to resolve "the appearance of ... uncertainty or contingency in [the] jury's verdict," *see Morris*, 612 F.2d at 489, and we are satisfied that the juror's reservation about the attorney's trial tactics did not undermine the unanimity of the verdict on Count I.

### III.

Antwine argues that the time span between the date on which he first was indicted and the date his trial began violated his constitutional and statutory rights to a speedy trial. We disagree.

■ A federal criminal defendant's right to a speedy trial is protected both by the Sixth Amendment and by the federal Speedy Trial Act. *See* U.S. Const. amend. VI; 18 U.S.C. § 3161 et seq. (1982 & Supp. V 1987). The Speedy Trial Act, 18 U.S.C.

---

**6.** Antwine does not contest the admissibility of   the evidence mentioned by Juror Foy.

§ 3161(c)(1), requires that the trial of a defendant commence within seventy days from the filing date of the information or indictment or from the date the defendant appeared before a judicial officer of the court, whichever last occurs. The sanction for violation of the Act, dismissal of the indictment, is triggered only by motion of defendant made prior to trial. 18 U.S.C. § 3162(a)(2). The defendant's failure to move for dismissal prior to trial constitutes a waiver of the right to dismissal under the Act. *Id.; United States v. Little,* 567 F.2d 346, 349 (8th Cir.1977), *cert. denied,* 435 U.S. 969, 98 S.Ct. 1608, 56 L.Ed.2d 60 (1978). Because Antwine failed to move for dismissal of the indictment on speedy trial grounds prior to trial, he has waived that remedy.[7]

■ We are also unable to find a violation of Antwine's right to a speedy trial under the Sixth Amendment. In *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Supreme Court identified four factors that courts should assess in considering a Sixth Amendment speedy trial claim: "[l]ength of delay, the

reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* at 530, 92 S.Ct. at 2192. Having considered those factors, we hold that Antwine's constitutional right to a speedy trial was not violated.

Antwine was tried within six months of the date he was indicted. We cannot say that this time span prejudiced him, *see Barker,* 407 U.S. at 530, 92 S.Ct. at 2192, in light of the valid reasons for the delays in this case. The only period of delay fairly attributable to the government was the time spent in evaluation of Antwine's competence to stand trial. The other delay in the case was occasioned by defense counsel, who sought a continuance to prepare Antwine's defense to the superseding indictment filed during Antwine's competency evaluation.[8]

Far from being prejudiced by these delays, Antwine's interests were served by them. The trial court properly sought a mental evaluation in order to assure that Antwine would not be prosecuted if mentally incompetent to proceed.[9] Similarly, it

---

7. Moreover, we cannot find on this record that the Act was violated. The Act provides that certain periods of delay must be excluded from the 70–day calculation. These include delay resulting from proceedings to determine the mental competency of the defendant and delay resulting from a continuance granted by the Court at the request of defense counsel, if based on a finding that the ends of justice served by taking such action outweigh the speedy trial interests of the defendant and the public. *See* 18 U.S.C. §§ 3161(h)(1)(A) and 3161(h)(8)(A). The record establishes that the delays in Antwine's prosecution were the result of proceedings to determine his mental competency and a continuance granted at the request of his attorney, both of which were excludable delays under the Act.

8. We reject Antwine's suggestion that defense counsel's request for a continuance constituted ineffective assistance of counsel and that therefore the delay should not be charged against him. Although defense counsel should have consulted Antwine before moving for a continuance, counsel's request represented his effort to provide the most effective assistance possible by allowing adequate time to prepare a defense. Moreover, the trial court specifically found that the "ends of justice" served by the continuance outweighed the defendant's interest in a speedy trial. *See* D.R. at 55.

We also reject Antwine's contention that the government's decision to obtain a superseding indictment placed it in a Catch-22 position under the Speedy Trial Act. His argument is that because § 3161(c)(2) guarantees a 30–day period to prepare for trial from the date of first appearance through counsel, the government could not have met its 70–day deadline and still have allowed Antwine 30 days to prepare a defense to the superseding indictment. *Compare* 18 U.S.C. § 3161(c)(1) (requiring that trial commence within 70 days of the date of indictment or of first appearance before judicial officer) *with* 18 U.S.C. § 3161(c)(2) (stating that trial shall not commence less than 30 days from the date on which the defendant first appears through counsel, unless defendant consents in writing to the contrary). This contention is answered by *United States v. Rojas–Contreras,* 474 U.S. 231, 106 S.Ct. 555, 88 L.Ed.2d 537 (1985), in which the Supreme Court held that the Speedy Trial Act does not require that the 30–day preparation period of § 3161(c)(2) recommence on the date a superseding indictment is filed. *Id.* at 234, 106 S.Ct. at 557.

9. The proceedings to determine Antwine's competency were not a "sham," as Antwine claims. Magistrate Hamilton based his order for mental examination on his own personal observations of Antwine's behavior at a hearing held before him on September 11, 1987, as well as on the

properly granted the continuance sought by defense counsel so that adequate time would be afforded defendant to prepare his defense to the superseding indictment. If either of those motions had been denied, the denials might well have been urged by Antwine as grounds for appeal. Antwine may not complain of delays occasioned by the trial court's attempts to protect his interests.

The judgment of the District Court is AFFIRMED.

suggestions made in support of the government's motion. *See* D.R. at 32.