UNITED STATES of America

v.

Russell Donald MAYO.

Crim. No. 92–34–S.

United States District Court,
M.D. Alabama, S.D.

April 24, 1992.

James E. Wilson, U.S. Atty., Steven M. Reynolds, Asst. U.S. Atty., for U.S.

J. Farrest Taylor, John Keith Givens, Dothan, Ala., for defendant.

## ORDER

MYRON H. THOMPSON, Chief Judge.

Defendant Russell Donald Mayo has been charged with possessing handguns in violation of 18 U.S.C.A. § 922(g)(1). This cause is currently before the court on his motion to suppress. Based on the evidence presented at two hearings, the court concludes that the motion should be denied.

## I. FACTS

On the evening of May 13, 1991, the Police Department in Enterprise, Alabama, received a telephone call informing the police that there was a drunk man with a shotgun in a trailer home and that the man had fired the shotgun. Two officers, Petty and Paul, responded to the call. When Officer Petty reached the trailer, he knocked on the front door and called over the bullhorn for Mayo, who was inside, to come out. Mayo did not respond.

When Officer Paul arrived, he encountered Mayo's wife and her two daughters on the street near the trailer. Mrs. Mayo told Paul that Mayo was drunk and had threatened her with a chair before chasing them out of the house and firing a shotgun after them. Paul then conferred with Petty before walking around to the rear of the trailer. Paul positioned himself by a large window at the back of the trailer which gave him a clear view of the trailer's interior. From there, he could see Mayo, apparently asleep, lying on a couch in the living room, with a shotgun beside him on the floor.

With Paul watching through the rear window to monitor Mayo's movements, Petty knocked on the front door. When Mayo roused himself off the couch and opened the door, Petty entered the trailer and picked up the shotgun. Paul then joined them in the trailer. Paul observed that the living room was in disarray and that a table and chair had been broken. As Petty spoke with Mayo, Paul made a protective sweep of the trailer to check for other occupants. Standing in the doorway of an adjoining bedroom, Paul looked in and observed two guns inside an open closet. Without disturbing these two guns, Paul completed his walk through the trailer and returned to the living room where Petty and Mayo were talking. The front door of the trailer bore the mark of a shotgun hole, wadding that had been discharged when a gun was fired lay on the floor by the door, and a box of shotgun shells lay on the table near the gun. At that point, Paul placed Mayo under arrest for menacing. The officers handcuffed him and put him in the backseat of one of the patrol cars. Paul returned to the trailer with a camera and, replacing the shotgun where it had lain next to the couch, took photographs of that gun and of the two guns that were still sitting in the bedroom closet, undisturbed. After taking additional photographs of the interior of the trailer, Paul collected all

three guns, the wadding, and the photographs, and left the trailer.

## II. DISCUSSION

### A.

Mayo challenges the warrantless entry and search of his home. He contends that the warrantless entry and search of a home is "presumptively unreasonable," and that this entry and search were not conducted pursuant to any of the recognized exceptions to the warrant requirement. The government contends that law enforcement officers may enter a premises and conduct a search for a suspect before obtaining a warrant when the officers reasonably believe that their safety or the safety of the general public is threatened.

■ The court therefore first considers whether the officers violated Mayo's fourth-amendment rights when they arrested him without a warrant in his home. A valid arrest warrant implicitly carries with it the authority to enter a suspect's residence when the arresting officers have reason to believe the suspect is inside. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). If the officers have not obtained a valid warrant, however, the fourth amendment ordinarily prohibits a warrantless entry beyond the doors of a suspect's home to make a routine felony arrest. *Id.* at 576, 586–89, 100 S.Ct. at 1380–81; *see also United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) (upholding warrantless felony arrest begun in public place but concluded in vestibule of home); *United States v. Davis*, 785 F.2d 610, 615 (8th Cir.1986) (upholding warrantless felony arrest in doorway where justified by probable cause and "some showing" of exigent circumstances). The more extensive intrusion is allowed only when (1) the officers have probable cause for the arrest, and (2) "exigent circumstances" exist justifying the intrusion. *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *see also United States v. Tobin*, 923 F.2d 1506, 1510

(11th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 299, 116 L.Ed.2d 243 (1991); *United States v. Burgos*, 720 F.2d 1520, 1525 (11th Cir.1983).

■ *Probable Cause.* Probable cause for an arrest exists when the police have knowledge of facts and circumstances sufficient to warrant a belief by a person of reasonable caution that the suspect has committed or is committing an offense. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225–26, 13 L.Ed.2d 142 (1964); *United States v. Allison*, 953 F.2d 1346, 1349–50 (11th Cir.1992). Probable cause may be based on information obtained from victims, *Easton v. City of Boulder*, 776 F.2d 1441 (10th Cir.1985), *cert. denied,* 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986), or witnesses, *United States v. Ellsworth*, 647 F.2d 957 (9th Cir.1981), *cert. denied,* 456 U.S. 944, 102 S.Ct. 2008, 72 L.Ed.2d 465 (1982).

Officer Paul testified that, in the months preceding this incident, he had responded to other calls arising out of domestic disputes between Mayo and his wife, including an incident in which Mayo had beaten his wife. When Paul arrived on May 13, Mayo's wife confirmed that Mayo possessed a gun and had threatened to harm her and her children. She also confirmed that Mayo had fired the gun out the trailer door. Under Alabama statute, a person commits the crime of menacing "if, by physical action, he intentionally places or attempts to place another person in fear of imminent serious physical injury." 1975 Code of Alabama § 13A–6–23(a) (Michie 1982 & Supp.1991). Therefore, based on the information he received from the tip and confirmed through Mrs. Mayo, Paul had probable cause to arrest Mayo for menacing.[1]

■ *Exigent Circumstances.* Exigent circumstances may arise when evidence is in imminent danger of destruction, *Ker v. California*, 374 U.S. 23, 41–42, 83 S.Ct. 1623, 1634, 10 L.Ed.2d 726 (1963), the police are in hot pursuit of a suspect, *United*

---

**1.** In addition, at the time Paul responded to the dispatcher's call he knew that Mayo had a prior felony conviction and therefore was prohibited by law from possessing a firearm.

*States v. Santana*, 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976), a suspect is likely to flee before the officers can obtain a warrant, *United States v. Milian–Rodriguez*, 759 F.2d 1558, 1565 (11th Cir.), *cert. denied*, 474 U.S. 845, 106 S.Ct. 135, 88 L.Ed.2d 112 (1985), or the safety of law enforcement officers or the general public is threatened, *Warden v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1646–47, 18 L.Ed.2d 782 (1967). Under this last exception, the scope of the search may be "as broad as may reasonably be necessary to prevent the dangers that the suspect at large in the house may resist or escape." *Id.* 387 U.S. at 299, 87 S.Ct. at 1647.

The Eleventh Circuit Court of Appeals has recognized several additional factors which may support a finding of exigent circumstances, including: the gravity or violent nature of the underlying offense; a reasonable belief that the suspect is armed; and strong reason to believe that the suspect is on the premises to be entered. *United States v. Standridge*, 810 F.2d 1034, 1037 (11th Cir.), *cert. denied*, 481 U.S. 1072, 107 S.Ct. 2468, 95 L.Ed.2d 877 (1987). *See also Welsh v. Wisconsin*, 466 U.S. 740, 752–53, 104 S.Ct. 2091, 2099, 80 L.Ed.2d 732 (1984) (the gravity of the underlying offense for which the arrest is being made is an "important factor"); *Payton*, 445 U.S. at 574, 100 S.Ct. at 1374 (explicitly limiting holding to felony arrests). Although there is no absolute rule prohibiting a warrantless in-home arrest on a misdemeanor charge, the Supreme Court has indicated that "When the government's interest is only to arrest for a minor offense, that presumption of unreasonableness is difficult to rebut."[2] *Welsh*, 466 U.S. at 750, 104 S.Ct. at 2098. Where the underlying offense is "extremely minor,"

the Court concluded, "it would be difficult to conceive of a warrantless arrest that would not be unreasonable." *Id.*

In this case, the offense of menacing, although categorized as a misdemeanor, involves threats of "imminent serious physical injury" which could support a warrantless in-home arrest. This element of physical violence distinguishes menacing from other misdemeanor offenses that have been deemed too "minor" to justify a warrantless home arrest. *See, e.g., Welsh*, 466 U.S. at 751, 104 S.Ct. at 2098 (although driving under the influence is minor offense, violence or threats of violence would be a factor supporting warrantless home entry). Moreover, the misdemeanor label does not fully reflect the government's compelling interest in addressing violence among family members. In 1989, in an effort to better address this serious problem, the Alabama legislature passed "The Law Enforcement Protection Act," 1975 Code of Alabama § 15–10–3(a)(8) (Michie 1982 & Supp.1991), also known as "The Family Violence Act," to authorize police officers to arrest without a warrant on either felony or misdemeanor charges if the offense involves family violence and if the arrest is based on probable cause. The statute specifically includes "menacing," § 13A–6–23, within the definition of "family violence." *See* § 15–10–3(a)(8) ("family violence" includes any offense defined under §§ 13A–6–20 through 13A–6–25). The passage of this act supports the court's conclusion that the misdemeanor status of the offense at issue should not bar a finding of exigent circumstances.

The court finds that the officers have demonstrated the necessity for immediate action in this case. Based on the information received from the tip and from Mrs. Mayo, the officers had strong reason to

**2.** Because this general rule is not grounded in the fourth amendment, the Supreme Court has refused to impose an absolute ban on warrantless home arrests for certain minor offenses. *Welsh v. Wisconsin*, 466 U.S. at 756, 104 S.Ct. at 2101 (White, J., dissenting) (court has never held warrant constitutionally required for arrest for nonfelony offenses); *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (rule restricting warrantless arrests for

misdemeanors is based in common law and is not required by fourth amendment). States remain free to expand the power to arrest without warrant through statute or constitutional amendment as long as the Constitution's requirement of probable cause is met. *Welsh*, 466 U.S. at 756, 104 S.Ct. at 2101 (White, J., dissenting) (common law authority to arrest without warrant may be enlarged by statute).

believe both that Mayo was inside the trailer and that he was armed. Moreover, Mrs. Mayo and her daughters were out on the street, unable to return to their home, while Mayo himself remained inside the trailer with a loaded gun which he had already fired once. Under these circumstances, the officers were justified in assuming that immediate action was necessary to protect the Mayo family and the general public from harm. "The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Warden v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967). Because Mayo refused to respond to the officers' calls over the bullhorn, only by entering his property could the agents take steps to neutralize the dangerous situation. The need for immediate action to protect the safety of the Mayo family and the general public provides the "exigent circumstances" necessary to justify the officers' warrantless entry.

## B.

■ After Officer Petty entered Mayo's trailer, but before the officers placed Mayo officially under arrest, Petty seized the shotgun that Mayo had left lying in the living room. After Officer Paul entered the trailer, but again before Mayo was arrested, Paul conducted a cursory inspection of the interior of the trailer during which he observed two guns in the bedroom closet. The government contends that these items are admissible. The court agrees.

Absent a search warrant, an arresting officer is not entitled to conduct a full-blown search even if incident to an in-home arrest. *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). In *Chimel*, however, the Supreme Court held that the fourth amendment permits police to conduct a "search incident to arrest" of both the person arrested and the area "within his immediate control" in or-

der to remove weapons that the suspect might use to resist arrest. *Id.* 395 U.S. at 762–63, 89 S.Ct. at 2040. Subsequently, in *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), the Court expanded the grant of authority in *Chimel* to permit police to make a limited "protective sweep" in conjunction with an in-home arrest, "to assure themselves that the house in which a suspect is being or has just been arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." *Id.* 494 U.S. at 333, 110 S.Ct. at 1098.

In *Buie*, the police obtained warrants to arrest Jerome Buie and another man on robbery charges. Police officers subsequently entered Buie's home and arrested him as he emerged from the basement. After searching Buie and handcuffing him, the arresting officer descended into the basement, "in case there was someone else" there. The officer did not find any other occupants but did see a red jogging suit. Aware that one of the suspects had worn a red jogging suit during the robbery, the officer seized the clothing. The Maryland Supreme Court held that the evidence would be suppressed because the search of the house was not authorized by a proper warrant and the police lacked probable cause for the search.

In an opinion authored by Justice White and supported by six members of the Court, the United States Supreme Court reversed. The Court found that the fourth amendment permits officers to conduct a limited "protective sweep" without probable cause as long as the officers possess "a reasonable belief based on specific and articulable facts" that the area to be swept harbors an individual posing a danger to those on the arrest scene. *Buie*, 494 U.S. at 336, 110 S.Ct. at 1099–1100.[3] The Court distinguished the limited "protective sweep" at issue in *Buie* from the "top-to-bottom search" that would be prohibited under *Chimel*. *Id.* 494 U.S. at 336, 110 S.Ct. at 1099. In addition, however, the Court expanded the scope of the search

---

**3.** The court relied on the "reasonable suspicion" standard articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), rather than on the "probable cause" standard.

that officers may conduct incident to any lawful home arrest. Although the facts in *Buie* did not present this issue for decision, the Court held that, as a "precautionary matter" and without either probable cause or reasonable suspicion, arresting officers may "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 333, 110 S.Ct. at 1098.

*Buie* thus establishes two standards that apply to a warrantless search incident to an in-home arrest. First, officers may routinely, and without any justification, make a limited visual inspection of "closets and spaces" adjacent to the place of arrest which might harbor a hostile third party. Second, officers. may extend the scope of their protective sweep to other areas of the house provided that they have a "reasonable suspicion" that such a search will uncover dangerous individuals whose presence poses a threat to the officers. In either case of a protective sweep, however, under the "adjacent-spaces" standard or the "reasonable-suspicion" standard, the search must be no more than a "cursory inspection" of those places where a person might be found and may last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 336, 110 S.Ct. at 1099.

The court finds that the officers were justified in seizing the gun that Mayo left on the living room floor as he answered the door. Because this action was necessary to ensure that Mayo did not use the gun against them during the course of the arrest, it was admissible under *Chimel*, 395 U.S. 752, 89 S.Ct. 2034, as well as under *Buie*'s adjacent-spaces standard, 494 U.S. at 334, 110 S.Ct. at 1098.

■ In addition, the gun is admissible under the "plain view" doctrine. In *Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990), the Court set forth the criteria which must be satisfied before evidence will be admitted under the "plain view" doctrine. First, the officer "must not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." *Id.* 496 U.S. at 138, 110 S.Ct. at 2308. Second, not only must the item be in plain sight, but its "incriminating character" must be "immediately apparent." *Id.* Third, the officer must have a "lawful right of access to the object itself." *Id.* Because the officers were lawfully positioned on Mayo's property when they observed the gun, knew that Mayo had used a shotgun to menace his wife, and had lawful access to the immediate interior of the trailer in order to arrest Mayo, the requirements of the "plain view" doctrine are satisfied here.

■ Relying on *Buie*'s reasonable-suspicion standard, the government contends that the guns discovered in the closet during the subsequent search are also admissible. 494 U.S. at 334–35, 110 S.Ct. at 1098–99. At the hearing, however, the government was unable to establish "articulable facts" which would warrant a reasonably prudent officer in believing that additional individuals were present in the trailer who might pose a danger to the officers. The only factual basis Officer Paul offered for his suspicion was that, in the past, he had often observed Mayo travelling in groups of two or three. The fact that Mayo frequently or customarily travels with others when in public does not provide adequate grounds for suspecting that other individuals will be hiding in Mayo's home, at night, while Mayo himself is asleep on the couch.[4] The government's reliance on the reasonable-suspicion standard is meritless.

■ The search and seizure of the two weapons was, however, proper under *Buie*'s adjacent-spaces standard. The bedroom doorway which adjoined the living room and from which Officer Paul saw the two guns falls within the *Buie* definition of a "spac[e] immediately adjoining the place

---

4. The court also finds it significant that Mrs. Mayo, who was present in the trailer with Mayo until he chased her out, apparently made no mention to the officers of any additional occu-

pants. It is most likely that, had she known of any, Mrs. Mayo would have shared this information with the arresting officers prior to their entry into the trailer.

of arrest from which an attack could be immediately launched." *Id.* at 334, 110 S.Ct. at 1098. Furthermore, because Paul was not engaged in a search of the bedroom but rather was merely standing in the doorway when he "looked in" and saw the guns, his search was cursory only. *See id.* at 338, 110 S.Ct. at 1100 (Stevens, J., concurring) (applying majority rule to find that officer could "reasonably have 'looked in' the already open basement door" but questioning decision to descend stairs). Therefore, despite the officers' lack of reasonable suspicion that onlookers actually did lurk in the next room, the cursory visual inspection of this room from the doorway was lawful. The two guns are admissible under *Buie.*

■■■■ The court will also admit the guns under the "plain view" doctrine. As already shown, Officer Paul did "not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." *Horton,* 496 U.S. at 138, 110 S.Ct. at 2308. The question therefore is whether the two remaining *Horton* conditions are satisfied: the incriminating nature of the guns must be obvious; and Paul must have had lawful access to the guns. In light of the fact that Mayo was a convicted felon and was suspected of menacing his wife with a gun, the evidentiary value of the firearms in his trailer would be immediately apparent. The more difficult

question is whether Paul, without reasonable suspicion that the bedroom concealed additional occupants, could lawfully enter the bedroom closet to retrieve the guns. Under *Buie,* Paul was authorized to *"look in"* a space or closet *"immediately adjoining* the place of arrest from which an attack could be immediately launched;" without reasonable suspicion, however, he could not venture any further. *Buie,* 494 U.S. at 333, 110 S.Ct. at 1098 (emphasis added). Paul did not run afoul of this limitation. He was able to reach for and retrieve the guns without opening the closet door and while legitimately remaining in the area of the bedroom. Because the closet door was open and because the closet was itself part of the bedroom, the two constituted one "adjoining space" within the meaning of *Buie.*[5] Indeed, it is because the bedroom and the open closet constituted one area that Paul was able to see the guns in the closet from the bedroom door.[6]

Accordingly, it is the ORDER, DECREE and JUDGMENT of the court that defendant Russell Donald Mayo's motion to suppress, filed March 16, 1992, be and it is denied.

DONE.

---

5. In contrast, if the closet door had been closed, the closet and the bedroom would not have constituted one area. Moreover, this court is not confronted with the conceivable scenario in which an officer standing in one room sees incriminating evidence in another room but the two rooms do not share a relationship similar to that shared by the bedroom and the closet in this case.

6. The government further contends that, based on the "public safety" exception to the fourth-amendment warrant requirement, the officers legitimately seized the two guns. Although it is not necessary to reach this difficult issue, the court notes, in order to provide a complete record, that it agrees with the government. In *United States v. Antwine,* 873 F.2d 1144, 1147 (8th Cir.1989), in upholding an officer's warrantless seizure of a gun, the Eighth Circuit Court of Appeals wrote that the officer's "legitimate concern for the safety of individuals may constitute 'exigent circumstances' justifying warrantless entries and searches." The court ex-

plained that the officer honestly believed that "he needed to obtain the weapon prior to leaving children in the home" and "that another course of action was not available to him." *Id.* Here, Officer Paul was confronted with the following plausible scenario: Mayo was a convicted felon in illegal possession of a gun; he had beaten his wife in the past; and, while under the influence of alcohol, he had just threatened his wife and his family with a gun. The court is convinced, and so finds, that Paul honestly and legitimately believed that, in order to protect Mrs. Mayo and her family, he had to confiscate all guns and could not take the risk that Mayo might make bond and return to his home before the police could obtain a search warrant. Indeed, if Paul had left the guns in the home and Mayo had later used one of them to injure or kill his wife or another member of his family, Paul's conduct would have been condemned as a gross dereliction of duty.