UNITED STATES of America, Appellee,

v.

**Richard ESTRADA, also known as Taco Estrada, Appellant.**

UNITED STATES of America, Appellee,

v.

**Daniel Greg DOSSETT, Appellant.**

Nos. 94–2816, 94–2817.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 13, 1994.

Decided Jan. 26, 1995.

Kent R. Cutler, Sioux Falls, SD, argued, for Estrada.

Thomas M. Keller, Sioux Falls, SD, argued, for Dossett.

Ted McBride, Sioux Falls, SD, argued, for appellee.

Before RICHARD S. ARNOLD, Chief Judge, FAGG, Circuit Judge, and WILSON,[1] District Judge.

---

1. The Honorable William R. Wilson, Jr., United States District Judge for the Eastern District of Arkansas, sitting by designation.

WILSON, District Judge.

On March 11, 1994, Richard Estrada and Daniel Dossett were convicted by a jury of conspiracy to distribute controlled substances in violation of 21 U.S.C. 846, and carrying a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. 924(c). Estrada appeals from the District Court's [2] 97–month sentence on the conspiracy charge and a consecutive five-year sentence on the gun charge. Dossett appeals from a 37–month sentence on the conspiracy charge and a consecutive five-year sentence on the gun charge. For the reasons discussed below, we affirm.

## BACKGROUND

In the fall and summer of 1993, law enforcement officers in Sioux Falls, South Dakota investigated Estrada for allegedly selling controlled substances. Estrada apparently provided cocaine to Dossett and others to sell. On October 24, 1993, an informant named Thomas Grote told Detective Donald Satterlee that Estrada was going to Sioux City, Iowa, that day to get cocaine. Later that day, Grote told Satterlee that he had been in Estrada's apartment and had seen about five ounces of cocaine that was quickly distributed and was taken from the apartment. Later, Grote called Satterlee again and advised him that there was more cocaine in the apartment and that the police should arrive quickly, because the contraband would soon be moved. Satterlee and the other officers contended that they were concerned that this contraband would disappear also, so they decided that they should secure the premises and then apply for a search warrant. One officer disguised himself as a pizza delivery man in order to gain entrance into Estrada's Sycamore Avenue apartment. The officers secured and searched the individuals present and made a quick sweep of the apartment looking for other occupants, but took nothing except the items found on the occupants. Mr. Satterlee obtained a search warrant about two hours later, and then conducted a search. The officers found cocaine, needles, a scale, cash, documents and firearms, and several people were arrested, including Estrada and Dossett.

At a hearing on defendants' motion to suppress, the government advised that it did not intend to introduce any evidence obtained before the search warrant arrived. The District Court ruled that the initial entry was not justified under the circumstances, because the officer testified that he would have sought a warrant in any event. Judge Piersol found that the search warrant was valid, and stated that the affidavit in support of the search warrant contained sufficient information to find probable cause even without any information obtained from the initial entry. At a second evidentiary hearing just before trial, the Court considered the question of whether a note discussing a gun was obtained before or after the warrant and ruled that it was discovered afterwards.

Regarding the charge of use of a firearm in connection with drug trafficking, Dossett and Estrada apparently distributed cocaine from the apartment, and the middle bedroom was used by both of them for drug distribution. A Mach 10, 9mm. pistol, a magazine for the Mach 10, and a .22 caliber revolver were found in this bedroom.

Defendants challenge the convictions on three grounds: they allege that the District Court failed to suppress illegally seized evidence, that the Court erred in failing to grant a new trial based on an allegation of juror misconduct, and they contend that the evidence at trial was insufficient to convict them of carrying or possessing a firearm in relation to a drug trafficking crime. Estrada and Dossett made identical arguments on appeal, except for some variation in their arguments regarding the gun charge.

## DISTRICT COURT'S RULING ON THE MOTION TO SUPPRESS

This Court will affirm the District Court's order denying the motion to suppress unless we find that the decision is unsupported by the evidence, based on an erroneous view of

2. The Honorable Lawrence L. Piersol, United States District Judge for the District of South Dakota.

the law, or the Court is left with a firm conviction that a mistake has been made. *United States v. Keene,* 915 F.2d 1164, 1167 (8th Cir.1990).

The Fourth Amendment decrees that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants, shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Supreme Court has ruled that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). Probable cause for issuing a search warrant exists where the magistrate makes a practical, common sense decision that "given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983).

■ In the instant case, appellants argued for the suppression of any evidence seized as a result of the search warrant that was obtained after the illegal entry. As an alternative argument, they assert that only those items that were not in plain view before the warrant arrived should have been admitted. Justice Holmes presented the rationale for what later came to be known as the "independent source" doctrine in *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920):

> The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed. (Cited in *Murray v. United States,* 487 U.S. 533, 538, 108 S.Ct. 2529, 2533–34, 101 L.Ed.2d 472 (1988).

The District Court determined that exigent circumstances did not exist because the officer testified that he would have sought a warrant in any event; the Court suppressed all evidence seized prior to arrival of the search warrant, but admitted evidence seized after the warrant arrived. In support of their arguments for upholding the District Court, appellee cites *United States v. Beck,* 662 F.2d 527 (8th Cir.1981), in which officers made an initial warrantless entry, secured the premises and then waited for two hours while one of the officers obtained a search warrant and returned with it. The officers in that case asserted that they had seen "a face in the window" and that someone had tried to close a door to prevent an officer from coming inside; the officers concluded that entry needed to be gained before evidence was destroyed. *Id.* at 528. The Court expressed "serious doubts" about whether exigent circumstances existed, saying that the officer's observations "without more" were essentially neutral. The *Beck* Court went on to hold, nonetheless, that "We need not determine whether exigent circumstances existed on this record, however, because the police uncovered the crucial evidence during a search conducted pursuant to a valid search warrant. The trial court need not suppress evidence gained through an independent source, notwithstanding any prior illegality." *Id.* at 530. The affidavit in *Beck* was based upon facts that existed prior to the entry of the defendants' residence. *Id.* In the instant case, the officer had gathered most of the information needed to secure a warrant weeks before the entry and had drafted the affidavit in support of a search warrant beforehand. The affidavit contained an extensive summary of Mr. Estrada's drug operation and a wealth of detail from informants who had seen cocaine inside Estrada's apartment, purchased cocaine there, and in other ways were knowledgeable about the drug operation. The affidavit also stated, *inter*

*alia,* that shortly before the entry, one of the informants indicated to the affiant that Estrada had cocaine inside the apartment. The District Court reviewed the affidavit and found that even without the information added as a result of the initial illegal entry, the pre-existing information was adequate to support the search warrant. Judge Piersol then properly admitted the evidence obtained after the warrant's arrival.

In denying the motion to suppress, the District Court cited, among other cases, *United States v. Templeman,* 938 F.2d 122 (8th Cir.1991) *(Templeman I ),* a case that appellant contends is not on point. It is true that *Templeman* is distinguishable from the case at bar, for the District Court in *Templeman* had made an erroneous ruling that where the officers had manufactured "exigent circumstances," a warrantless entry was nonetheless still justified. *Templeman,* at 124. In *Templeman,* postal inspectors who had a search warrant opened an Express Mail package containing cocaine addressed to Dwight Stowe, who later told officers that the package was for Mr. Templeman; after Stowe delivered the package containing cocaine to Templeman at the latter's residence, the officers made a warrantless security sweep and search of Templeman's residence and then obtained a warrant for a second search conducted about two hours after the initial entry. *Id.* at 124. Finding that officers cannot manufacture exigent circumstances to justify a warrantless entry, this Court remanded for a determination of whether the affidavit had presented sufficient evidence not seized in the initial illegal entry to support issuance of the warrant. *Id.* at 125. After remand, the District Court found that the government did not discover the evidence as a result of the initial illegal search, and therefore admitted the evidence. *United States v. Templeman,* 965 F.2d 617, 618 (8th Cir.1992) *(Templeman II ), cert. denied,* —— U.S. ——, 113 S.Ct. 482, 121 L.Ed.2d 387 (1992). Although differing somewhat in its fact pattern from the instant case, *(Templeman* involved drugs that had already been intercepted by postal inspectors pursuant to a valid search warrant prior to the warrantless entry at Templeman's home) the two *Templeman* cases clearly re-affirmed

the principle in *Beck, supra, United States v. Williams,* 737 F.2d 735 (8th Cir.1984) and progeny that a search executed under a valid warrant will be upheld even though the affidavit may have contained some information obtained during a prior illegal search; in those cases this Court found that the affidavits supporting the warrant were sufficient without any of the information acquired during the prior entry. *Templeman I,* 938 F.2d at 125.

*Beck, Templeman* and progeny are consistent with the Supreme Court's ruling in *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). The *Segura* Court focused on the precise issue of whether "drugs and the other items not observed during the initial entry and first discovered by the agents the day after the entry, under an admittedly valid search warrant, should have been suppressed." *Segura,* at 804, 104 S.Ct. at 3385. The Court cited the principle based on *Silverthorne, supra,* that the exclusionary rule does not apply where the government learned of the evidence from an independent source. *Id.* at 805, 104 S.Ct. at 3385–86. In *Segura,* as in the instant case, there was no challenge to the validity of the warrant itself, but appellants argued that because the contents of the residence were then under the control of the agents, no one had been permitted to remove the incriminating evidence. The Supreme Court rejected the reasoning that evidence should be suppressed simply because it could have been destroyed or removed had the agents not made the illegal entry and "occupation" of the apartment. *Id.* at 803, 104 S.Ct. at 3384–85. The Court approvingly cited the Second Circuit's ruling in *United States v. Agapito,* 620 F.2d 324 (2nd Cir.), *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980), in which law enforcement officers arrested suspected occupants of a hotel room that had been under surveillance; the officers entered the room without a warrant and remained there almost continuously for roughly 24 hours until a search warrant was issued. During that time the agents seized but did not open a suitcase found in the room, and in a search pursuant to a warrant, the agents found cocaine in the suitcase. The Supreme

Court approved the *Agapito* holding that although the initial entry was illegal, the cocaine need not be suppressed because it was discovered in the search under a valid warrant. *Segura*, 468 U.S. at 803 n. 5, 104 S.Ct. at 3384 n. 5, citing *Agapito*.

The *Segura* Court stressed that the information upon which the warrant was secured

came from sources wholly unconnected with the entry and was known to the agents well before the initial entry ... The valid warrant was a means 'sufficiently distinguishable' to purge the evidence of any 'taint' arising from the entry. *Wong Sun v. United States*, 371 U.S. 471, 488 [83 S.Ct. 407, 417, 9 L.Ed.2d 441] (1963). Had police never entered the apartment, but instead conducted a perimeter stakeout to prevent anyone from entering the apartment and destroying evidence, the contraband now challenged would have been discovered and seized precisely as it was here. *Segura*, 468 U.S. at 814, 104 S.Ct. at 3390.

In the instant case, the officer had gathered the heart of the information upon which the warrant was based before the entry was made, and the affidavit was actually drafted before the entry. As in *Segura*, it is safe to conclude that if the police had not entered the apartment, but held a perimeter stakeout, the evidence would have been found and seized in the same way.

Chief Justice Burger stated in *Segura* that "securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought, is not itself an unreasonable seizure of either the dwelling or its contents." *Id.* at 810, 104 S.Ct. at 3388. Burger also argued that the illegality of the initial entry does not affect the reasonableness of the seizure, because under "either method—entry and securing from within or a perimeter stakeout— agents control the apartment pending arrival of the warrant; both an internal securing and a perimeter stakeout interfere to the same extent with the possessory interests of the owners." *Id.* at 811, 104 S.Ct. at 3388. Appellee cites Burger's observation on this point, but it is unnecessary to rely on this statement in affirming the District Court.

The Chief Justice's observation finding no difference between a stakeout and an "internal securing" is obviously not of binding authority, because only Justice O'Connor joined him in that section (Part IV) of the opinion; Justices Powell, White, and Rehnquist did not join Part IV of Burger's opinion (Justices Stevens, Brennan, Blackmun, and Marshall dissented, so that seven of the nine justices did not join Part IV). Despite Chief Justice Burger's equating of a "perimeter stakeout" and an "internal securing" in the passage cited above, he also wrote that "In this case, the agents entered and secured the apartment from within. Arguably, the wiser course would have been to depart immediately and secure the premises from the outside by a 'stakeout' once the security check revealed that no one other than those taken into custody were in the apartment." *Segura*, Part IV, at 811, 104 S.Ct. at 3388–89. All the other passages from *Segura* cited in this Court's opinion are taken from sections of that decision in which a majority of the Supreme Court joined; the notion that a "perimeter stakeout" and an "internal securing" of the premises involve identical intrusions into the owners' possessory interests clearly has no support in Supreme Court precedent. Appellee need not rely on Part IV of *Segura*, however, for there are abundant grounds for affirming the District Court's decision without any reference to Part IV.

In *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988), the Supreme Court addressed an important issue not dealt with in *Segura:* whether evidence in plain view at the time of an earlier illegal entry must be suppressed when seized pursuant to a later search warrant secured upon information wholly unconnected with the illegal entry. In *Murray*, officers had the defendant under surveillance, based upon information supplied by an informant, when Murray and a codefendant were seen driving trucks into a warehouse. *Murray*, at 535, 108 S.Ct. at 2532. Murray left the warehouse minutes later and turned the truck over to other drivers, who were followed and arrested, and the vehicles were lawfully seized. The vehicles were found to contain marijuana. After learning of the seizure of

these vehicles, agents forced entry into the warehouse and observed in plain view bales that were later found to contain marijuana. They left without disturbing the bales, kept the warehouse under surveillance, and did not reenter it until they had a search warrant. In their application for the search warrant, they did not mention the prior entry and did not rely on anything they had seen during that entry. When the warrant was issued eight hours later, the agents reentered the warehouse and seized numerous marijuana bales. The Court accepted the government's view in that case that the independent source doctrine "applies also to evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality." *Id.* at 537, 108 S.Ct. at 2533. The Court reasoned,

> Knowledge that the marijuana was in the warehouse was assuredly acquired at the time of the unlawful entry. But it was also acquired at the time of entry pursuant to the warrant, and if that later acquisition was not the result of the earlier entry there is no reason why the independent source doctrine should not apply. Invoking the exclusionary rule would put the police (and society) not in the same position they would have occupied if no violation occurred, but in a worse one. *See Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 2508–09, 81 L.Ed.2d 377 (1984).

The *Murray* Court emphasized that to determine whether the warrant was independent of the illegal entry, the Court should determine whether the warrant would have been sought "even if what actually happened had not occurred ... what counts is whether the actual illegal search had any effect in producing the warrant, not whether some hypothetical illegal search would have aborted the warrant." *Id.* 487 U.S. at 542 n. 3, 108 S.Ct. 2536 n. 3. In the instant case, Detective Satterlee testified that he would have applied for the search warrant even if there had been no entry. The District Court found his testimony credible and ruled that he would have proceeded to make the application for a warrant even without the illegal entry. This passes the standard as stated in *Murray.*

Appellant contends that Judge Piersol "disregarded" *United States v. Duchi,* 906 F.2d 1278 (8th Cir.1990) in his ruling on the motion to suppress. Appellant's reliance on *Duchi,* however, is misplaced, for that case is clearly distinguishable from the one at bar. In *Duchi,* the District Court ruled that "exigent circumstances" did justify a warrantless entry where the defendant was probably in the residence, the defendant had a propensity for disposing of evidence when alerted of police surveillance, and a package that had been altered by police and contained cocaine was in the residence. *Duchi,* at 1279. The District Court was concerned that evidence would be destroyed before a search warrant could issue. In clear contrast to *Duchi,* the District Court in the instant case found that the warrantless entry was not justified by "exigent circumstances." Judge Piersol suppressed any items taken during the initial entry and reviewed the affidavit supporting the warrant, without the information added as a result of that entry, and concluded that the pre-existing information was adequate to support the warrant. In reversing the District Court's decision in *Duchi,* the Eighth Circuit stressed that the "exigent circumstances" exception countenances warrantless entries because of the urgency of the situation; "the warrant requirement is suspended when—in the press of circumstances beyond a police officer's control—lives are threatened, a suspect's escape looms, or evidence is about to be destroyed ... The circumstances relied on by the District Court are not exigent." *Id.* at 1282.

The *Duchi* Court ruled that when the government creates or controls an exigent circumstance it cannot use that circumstance to justify a warrantless entry; in applying this principle, the question should be asked: "How did those urgent circumstances come about?" *Id.* at 1284. The *Duchi* Court emphasized that there was no question that "deliberate creation of urgent circumstances is unacceptable ... But bad faith is not required to run afoul of the standard we adopt and apply today. As Justice Jackson noted, the danger to constitutional rights more often comes from 'zealous officers' rather than faithless ones." *Duchi,* at 1284, cit-

ing *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). The Court does not accept appellant's assertion that *Duchi* and the instant case are factually similar. In *Duchi*, the case began with an undeliverable package: a parcel addressed to C. Conrad was sent to a certain bar, but no one by that name was there. UPS then opened it in an effort to locate a sender's address or more information about the intended recipient. The UPS employee noticed a white substance in a clearly visible tear in the package and called police, who examined the substance in the tear and found it to be cocaine. The officers decided to confirm that the recipient was Mr. Duchi by sending the package to his residence after substituting a book for some of the cocaine, keeping part of the cocaine as evidence lest the entire parcel be lost or destroyed after delivery. *Id.* at 1279–80. This drastic alteration of the package's contents guaranteed that the recipient would be alerted to the police investigation as soon as he opened the box, and the officers pointed to the immediate danger that the contents would be swiftly disposed of as one of the crucial circumstances that prevented them from securing a warrant. This heightened danger of destruction, however, was reasonably foreseeable, and "since that danger was created by the officers' investigative strategy, it cannot justify their warrantless entry." *Id.* at 1285. When the officers arrived at Duchi's residence, they advised him that they would apply for a search warrant if he refused to consent to the search, and he eventually signed a consent form. *Id.* at 1280. In *Duchi*, a subsequent search warrant was never issued, thus clearly distinguishing it from the instant case. Since the Eighth Circuit in *Duchi* rejected the District Court's finding of exigent circumstances, the warrantless entry was unjustified and the consent to search was invalid as "fruit of the poison tree." *Duchi* does not address the issue of the impact of a subsequent valid search warrant.

Appellant's reliance upon *United States v. Marts*, 986 F.2d 1216 (8th Cir.1993) is also misplaced. The District Court in that case did not discuss the independent source rule, and the government did not raise this issue on appeal. *Marts*, at 1219–20. *Marts* involved a different set of issues from the case at bar: officers knocked on a door quickly two or three times, announced that they were the police and had a search warrant, and then after waiting only five seconds entered the residence. The Court in *Marts* found that the Martses were not allowed adequate time to grant admittance to the officers, and hence there was a violation of the "knock and announce rule" codified in 18 U.S.C. 3109.[3] The District Court in *Marts* found that the officers neither heard nor saw anything inside the residence, and that although an informant had told them that he had observed firearms in the residence during previous drug transactions, there was no information indicating that Marts was violent. The Eighth Circuit affirmed, holding that a reasonable belief that firearms may have been within the residence was alone insufficient to excuse a violation of the rule. The officers in *Marts* searched the premises immediately upon illegal entry, in contrast to the search in the instant case. *Id.* at 1220. The *Marts* Court distinguished that case from *Segura*, observing that "The significant factor in *Segura* is that the search warrant and the evidence seized under it were totally unrelated to the illegal entry." *Id.* Appellants' arguments based upon *Marts*, as well as their other arguments, provide no basis for overturning the District Court's decision on the motion to suppress.

---

**3.** The statute provides: "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant." 18 U.S.C. 3109.

This Court stated in *Marts* that the "knock and announce" rule safeguards Fourth Amendment rights, "protecting citizens from violations through the misconduct of police officers ... In fighting the 'war on drugs,' officers have every reason to be fearful of hostility and even gunfire. However, a ruling which excuses actions which would otherwise constitute clear misconduct, based upon the subjective fears and beliefs of officers, would emasculate the rule, reducing it to nothing more than a 'knock and enter' rule." See also *United States v. Moore*, 956 F.2d 843, 850 (8th Cir.1992).

The District Court's ruling in suppressing all evidence obtained by the initial illegal entry, but allowing the evidence obtained after the search warrant was obtained, is hereby affirmed.

## CREDIBILITY ISSUE

■ Shortly before trial, the District Court held another hearing to resolve an issue of conflicting evidence that had not been specifically addressed at the initial suppression hearing. Detective Satterlee had stated at the first hearing that officers found a note regarding the apparent use of firearms by Estrada, Dossett and another person in connection with the drug trafficking; he said the note was found under documents that were "sifted through later." Agent Barry Menenga of the South Dakota Division of Criminal Investigation testified that he found those papers when he searched Dossett, before the arrival of the search warrant. At the second hearing, the government recalled Menenga, who then testified that the note in question did not come from Dossett's wallet. Satterlee then testified that although he was in charge of gathering evidence, he did not seize all of the evidence himself, and those who actually seized a document would be in a better position to remember where it came from. Satterlee stated that he did not see the note until several days later, and admitted that he was mistaken in his previous statement regarding the note. Detective Steve Johnson testified that he found the note after the arrival of the search warrant. Judge Piersol found that it would be unlikely that Dossett would have been carrying a note addressed to someone else in his wallet, and concluded that the government had met its burden of demonstrating that the note was acquired after the issuance of the search warrant. This finding involved a determination of the credibility of the witnesses—including the testimony of Detective Johnson, the person who discovered the note. The District Court is obviously in the best position to determine a credibility question, the Court finds no error in this decision.

## THE GUN CHARGE

■ Estrada and Dossett contend that there is insufficient evidence to find that the firearms discovered in the Sycamore Avenue apartment were used in connection with drug trafficking or could be attributed to either of them. The relevant statute provides that "Whoever, during and in relation to any crime of ... drug trafficking ... uses or carries a firearm, shall, in addition to the punishment provided for such drug trafficking crime, be sentenced to imprisonment for five years." 18 U.S.C. 924(c). In reviewing challenges to the sufficiency of the evidence to sustain the conviction, "we must affirm the conviction if, after viewing the evidence in the light most favorable to the government and giving the government the benefit of all reasonable inferences, we conclude that a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Mejia,* 8 F.3d 3, 5 (8th Cir.1993) (quoting *United States v. Jones,* 990 F.2d 1047, 1048 (8th Cir.1993).

This Court has repeatedly recognized "the utility of firearms in advancing criminal adventures in narcotics." *United States v. Milham,* 590 F.2d 717, 721 (8th Cir.1979); *United States v. LaGuardia,* 774 F.2d 317, 321 (8th Cir.1985). The *LaGuardia* Court stressed that "the presence and availability in light of the evident need demonstrates the use of the firearm to commit the felony." *LaGuardia,* at 321. Similarly, in *United States v. Jones, supra,* the appellant contended that "the government failed to prove, and may conceptually be unable to prove, that he used the gun 'during and in relation to' his 'intent to distribute' the controlled substances." *Jones* 990 F.2d at 1048. The Court concluded that since Jones kept the gun in close proximity to the contraband, "a reasonable jury might also infer that the paraphernalia found in the apartment was used to prepare the drugs for sale and that the gun was important for the protection and success of Jones' enterprise as a whole." *Id.* at 1049. The Court also observed that a defendant need not brandish or discharge the firearm in order for a jury to find that he used it in relation to a drug trafficking crime; "rather, 'use' may be inferred from the availability and presence of the firearm, and actual possession is not necessary provided the

firearm is under the defendant's control." *Id.* at 1050. The jury only needs to find "a sufficient nexus between the gun and the drug trafficking crime," and to establish this nexus the gun does not have to be "located in the room where the drug transaction occurs." *United States v. Horne,* 4 F.3d 579, 587 (8th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1121, 127 L.Ed.2d 430 (1994); *see also United States v. Boykin,* 986 F.2d 270, 273–274 (8th Cir.) (handguns in upstairs bedroom, drugs and cash found in kitchen and living room downstairs), *cert. denied,* —— U.S. ——, 114 S.Ct. 241, 126 L.Ed.2d 195 (1993); *United States v. Simms,* 18 F.3d 588, 592 (8th Cir.1994). This Court has ruled that "A Section 924(c) conviction requires only that the weapon be present and available, in the house in which the drugs and cash are located, in the event it is needed." *United States v. Johnson,* 12 F.3d 827, 833 (8th Cir.1994).

In the instant case, a Mach 10 and a .22 caliber revolver were found in the middle bedroom, which was utilized by both Estrada and Dossett for drug distribution. A magazine for the Mach 10 with several 9mm. rounds in it was found five to seven feet from the bed. One witness, Kim Thompson, testified that she saw Dossett and Estrada in that bedroom, which belonged to Dossett. Another witness stated that he purchased cocaine in either of the bedrooms from either Estrada or Dossett, and yet another testified that he had seen Dan Dossett with guns. The note that Judge Piersol decided not to suppress (discussed above) stated that "Dan says one of the pieces is loaded, so be careful!!" In the only section of Dossett's brief which differs from Estrada's, Dossett contends that several witnesses testified that Dossett was non-violent. Dossett concedes that he stated that he would like to buy a machine gun and that he was seen cleaning a gun on at least one occasion, but asserts that those facts "had nothing to do with the drug operation." Dossett did not deny that the guns were in close proximity and available to protect drugs and cash in a room used by both Dossett and Estrada. The Mach 10 was not loaded but it was near the partially loaded magazine and could have been used in a matter of seconds. The Court concludes that the jury could reasonably find that the fire-

arms were present and available for use in drug trafficking. *Johnson, supra,* at 833.

## ISSUE REGARDING ALLEGED JUROR MISCONDUCT

The trial began on March 8, 1994 and ended on March 11, 1994. Estrada and Dossett moved for a new trial when they learned that a juror named Orrell Hanson had contacted the Minnehaha County Public Defender, Jack Der Hagopian, during the trial. At a hearing on the new trial motion, Der Hagopian testified that on March 10, an individual called him with a question about search warrants. Der Hagopian replied with a few brief, general comments about search warrants. The individual on the telephone then inquired about the legality of whether officers had to have a search warrant with them and show it when they entered the premises. Der Hagopian said the real issue would be whether or not the warrant existed, not whether they had it with them, but admonished the person that if he had an actual case in mind, he needed a lawyer's assistance; he then asked whether the individual was represented by counsel, whereupon the person on the line said he was sitting on a jury, describing a drug case that happened to be similar to one then taking place in state court in Sioux Falls. Der Hagopian then asked for his name and advised him that he needed to tell the judge about this telephone conversation, whereupon the individual identified himself as Orrell Hanson. Der Hagopian had no factual information concerning the trial upon which Hanson was sitting as a juror. The conversation between Hanson and Der Hagopian was brief.

Der Hagopian immediately reported this contact to the judge in the state case in Sioux Falls, thinking that Hanson must have been a juror in that case; and thus the U.S. District Court did not learn of the contact between Hanson and Der Hagopian until after the federal trial was over. At the hearing held in the District Court regarding the new trial motion, Hanson conceded that he had understood the instructions given him by the trial court regarding outside contacts. He admitted that he had contacted Der Hagopian during the trial, failed to inform

Judge Piersol of this contact, but still participated in the jury's deliberations regarding the Estrada–Dossett case. Mr. Hanson said, "The only reason that I did it was because, see, when they were talking about that search warrant that they served there, and then they said that they had to get another one or whatever, I wanted to make sure that their civil rights weren't broke, you know ..." Hanson did not convey the small amount of information he received from Der Hagopian to any of the other jurors. The District Court found that the improper contact was confined to one juror, although Judge Piersol was aware that an impact on one juror alone could provide a basis for a new trial. The Court found that Hanson's inquiry was not a search for factual information, and the brief legal generalizations he obtained in the telephone call constituted harmless error.

Federal Rule of Evidence 606(b) provides that

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

The District Court denied the motion for a new trial based on defendant's arguments related to the contacts between Hanson and Der Hagopian. In determining whether to overturn the decision of the District Court in denying the motion for a new trial, the Court applies an abuse of discretion standard of review. *United States v. Schnurstein,* 977 F.2d 449, 454 (8th Cir.1992). To overturn a

verdict based on jury misconduct the defendant must "(1) produce evidence which is not barred by the rule of juror incompetency and (2) produce evidence sufficient to prove grounds recognized as adequate to overturn the verdict." *United States v. Krall,* 835 F.2d 711, 715 (8th Cir.1988). The touchstone of decision in cases involving "extra-record evidence is not the mere fact of infiltration of some molecules of extra-record matter ... but the nature of what had been infiltrated and the probability of prejudice." *United States ex rel. Owen v. McMann,* 435 F.2d 813, 818 (2d Cir.1970).

Appellants primarily rely upon *United States v. Delaney,* 732 F.2d 639 (8th Cir. 1984) in challenging the District Court's ruling on the juror misconduct issue. In *Delaney,* the jury foreman, Douglas Morgan, asked a police officer about probation procedures. Delaney was charged with knowingly making a false statement in acquiring a firearm, and with two counts of receipt of a firearm by a convicted felon. *Delaney,* at 641. Morgan had asked whether a parolee "is advised of the condition of his parole when he is placed on parole by his parole agent." The police officer replied, "As far as I know they were. In fact, that in cases I was aware of they were given a copy of the parole agreement." The District Court in *Delaney* questioned Morgan about his contact with the officer, and Morgan stated that he had been thinking about whether Morgan was read "the charge and the rights," to determine whether he was aware of the conditions of his probation. *Id.* at 642. The Eighth Circuit held that the misconduct here would prejudice Mr. Delaney's right to a fair trial. The information the police officer passed along to the jury foreman "concerned the primary factual issue before the jury on Count I, which was whether Delaney 'knowingly' made a false statement when he stated on his application for a firearm that he had never been convicted of a crime punishable by imprisonment for a term exceeding one year." *Id.* Delaney had testified at trial that he thought his criminal record had been wiped clean when he finished his probation, and thus did not knowingly misrepresent his record. But the officer's statement that "parolees generally know of the terms and con-

ditions of their parole" could have given Morgan reason to doubt Delaney's testimony, the Eighth Circuit concluded: "Morgan may plausibly have inferred from this statement that as a person on probation, Delaney was aware of the terms and conditions of his probation, including his continuing status as a felon." *Id.* at 643. Such an inference was directly contrary to Delaney's defense, and the potential influence upon the jury's deliberations was particularly strong because Morgan was the foreman; thus the prejudice was apparent. "Morgan received information that not only questioned Delaney's contention that he had been unaware of his felony record, but also challenged his general credibility and character." *Id.* at 644.

Appellant's reliance upon *Delaney* is misplaced. The foreman's contacts in *Delaney* were relevant to factual issues and undermined the entire credibility of Delaney's testimony, the Eighth Circuit held; in contrast, in the instant case Mr. Hanson asked a question about a legal issue (that the District Court, of course, had decided at the suppression hearing). Der Hagopian testified at the hearing on the new trial motion that Hanson asked him about "the legality of whether they had to actually have [the search warrant] with them and show it-type of thing when they entered the premises." This legal issue was obviously not presented to the jury, and Hanson was thinking about an irrelevancy. The extrinsic material here had no relevance to any primary factual issue before the jury nor to any credibility questions. Credibility of the drug customers' testimony was a crucial issue in the case, but whether the search warrant was actually present and shown at the time of the search bore no rational relationship to this credibility question. *See United States v. Bagnariol,* 665 F.2d 877, 888–89 (9th Cir.1981) (per curiam), *cert. denied,* 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982).

■ If a juror is exposed to extraneous information that involves merely supplementing the Court's legal instructions it remains within the province of the judge to determine whether this conduct distorted the jury's understanding of the law to the prejudice of the defendant. *United States v. Cheyenne,* 855

F.2d 566, 567 (8th Cir.1988); *United States v. Griffith,* 756 F.2d 1244, 1252 (6th Cir.), *cert. denied,* 474 U.S. 837, 106 S.Ct. 114, 88 L.Ed.2d 93 (1985). In *Cheyenne,* this Court did not disturb the District Court's finding that jurors' improper consultation of a pocket dictionary regarding words in the jury instructions did not prejudice the defendant. *Cheyenne,* 855 F.2d at 567. The Court applies a different standard if the extraneous information relates to factual matters at issue in the case: such extraneous information is considered presumptively prejudicial. *Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954); *United States v. Sublet,* 644 F.2d 737, 740 (8th Cir.1981). Where the jury considers factual evidence not developed at trial, "the error is presumptively prejudicial because the jury is the final arbiter of factual disputes." *Cheyenne, supra,* 855 F.2d at 568. In the instant case, the District Court ruled that this case is similar to the *Cheyenne* line of "dictionary" cases rather than the "presumptively prejudicial" cases, but under either analysis the outcome is the same.

Judge Piersol concluded that Mr. Hanson's contact with Mr. Der Hagopian was analogous to the contact in the "dictionary" cases, in which a juror or jurors supplement instructions with definitions from a dictionary; courts have ruled that such supplementation does not concern information about a factual matter at issue in the case. *Griffith, supra,* 756 F.2d at 1252; *Cheyenne, supra,* 855 F.2d at 568. These cases are distinguished from the "presumptively prejudicial" cases where the contact or information is "about the matter pending before the jury." *Remmer, supra,* 347 U.S. at 229, 74 S.Ct. at 451. The District Court observed that analyses in the "dictionary" cases have focused on determining whether the definitions improperly modify or change the jury instructions to the defendant's prejudice. *Cheyenne,* 855 F.2d at 568. On appeal, this Court gives "substantial weight to the trial court's appraisal of the prejudicial effects of extraneous information on the jury, since the trial judge has the advantages of close observation of the jurors and intimate familiarity with the issues at trial." *Cheyenne,* at 567. The Public Defender had no factual information regard-

ing the case upon which Mr. Hanson sat as a juror. Mr. Der Hagopian gave Hanson only a brief sketch of general procedures regarding search warrants. He made it clear to Mr. Hanson that his comments were "off the cuff" and that actual facts in the specific setting of a case would be crucial for any legal determination. Judge Piersol correctly concluded that it was improper to resolve this question based on the argument that a person rather than a book was consulted regarding additional information about legal matters. Even more importantly, the District Court pointed out one distinction between the instant case and the "dictionary" cases: nothing that Der Hagopian told Hanson concerned a legal issue in this case, since the validity of the warrant was not at issue. This Court finds no error in the District Court's finding that no prejudice to the defendants resulted from the few generalizations the juror received from Der Hagopian regarding search warrants.

In another case where a person rather than a book was consulted by a juror, a trial court's law clerk was asked by a juror whether the defendants would have a right to appeal if they were convicted, whereupon he replied, "Normally, if the government loses, that's the end of the case. There's no right of appeal for the government. But if the defendants should lose, they have a right of appeal as a matter of right." *United States v. LaSpesa*, 956 F.2d 1027 (11th Cir.1992). The Eleventh Circuit in *LaSpesa* affirmed the District Court's finding that the law clerk's remarks were not sufficiently prejudicial to justify a mistrial. *LaSpesa*, at 1034. The *LaSpesa* Court took note of the Court's instruction that the jury was not to consider matters relating to the ultimate disposition of the case nor any extraneous comments heard outside the trial context. *Id.* The District Court in the instant case gave similar instructions to the jury. The Supreme Court has ruled that courts must presume that jurors followed such instructions. *Francis v. Franklin*, 471 U.S. 307, 326 n. 9, 105 S.Ct. 1965, 1976 n. 9, 85 L.Ed.2d 344 (1985).[4]

In numerous other similar cases, courts have ruled that extrinsic influences on jurors generally similar to those in *LaSpesa, supra,* did not taint the verdicts. For example, in *United States v. Dynalectric Co.*, 859 F.2d 1559, 1582 (11th Cir.1988), a juror consulted notes from a health law class, but the Court concluded that the substance of the notes was "not dramatically different from what the judge actually charged the jury." The Third Circuit in *United States v. Gilsenan*, 949 F.2d 90, 95 (3d Cir.1991) upheld a District Court's denial of a new trial in a case where jurors had read newspaper articles about abortive plea negotiations in the case; the Court concluded that newspaper accounts made it appear that the government's case "was extremely weak and that it was desperate to salvage something from the prosecution." The appellants could not have been prejudiced by media attention revealing the government's admission "on the eve of trial that it had a weak case." *Gilsenan,* at 95. In *United States v. De La Vega*, 913 F.2d 861, 870–71 (11th Cir.1990), the Court concluded that the defendants were not prejudiced by the fact that the jury foreman consulted a book on jury duty entitled, "What You Need to Know for Jury Duty," and used it to organize the jury's deliberations. Similarly, in *United States v. Bassler*, 651 F.2d 600, 600–03 (8th Cir.1981), a juror's consultation of a "procedural" book about the jury's

---

4. The Supreme Court in *Francis* stated that "The Court presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them. Cases may arise in which the risk of prejudice inhering in material put before the jury may be so great that even a limiting instruction will not adequately protect a criminal defendant's constitutional rights. *E.g., Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Absent such extraordi-

nary situations, however, we adhere to the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions. As Chief Justice Traynor has said: "We must assume that juries for the most part understand and faithfully follow instructions. The concept of a fair trial encompasses a decision by a tribunal that has understood and applied the law to all material issues in the case." R. TRAYNOR, THE RIDDLE OF HARMLESS ERROR, 73–74, quoted in *Connecticut v. Johnson*, 460 U.S. 73, 85 n. 14, 103 S.Ct. 969, 977 n. 14, 74 L.Ed.2d 823 (1983) (opinion of BLACKMUN, J.).

duties was not sufficiently prejudicial to merit a new trial.

Although the contact in the instant case is analogous to *LaSpesa* and similar cases, the District Court also examined this contact under the standard in the "presumptively prejudicial" cases. Judge Piersol acknowledged that the facts in this case do not fit neatly into either of the two categories. The Supreme Court held in *Remmer* that:

> In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant. *Mattox v. United States,* 146 U.S. 140, 148–150, 13 S.Ct. 50, 52–53, 36 L.Ed. 917; *Wheaton v. United States,* (8th Cir.) 133 F.2d 522, 527.

In applying the presumption of prejudice, the District Court was correct in its finding that the contact was harmless to the defendant. The Public Defender had no factual information regarding the case, and the sketchy generalizations about search warrants—qualified by his statement to the juror that the crucial question would be the facts in the specific case, a matter about which he of course knew nothing—could not have been harmful to defendants. Indeed, Mr. Hanson's thinking was directed in a manner sympathetic to defendants, as he stated that "I wanted to make sure their civil rights weren't broke." Above all, this brief conversation focused on a question—the validity of a search warrant—that was not an issue in the trial. The government met its burden to demonstrate that the contact in the instant case was harmless to the defense.

The District Court also rejected appellants' contention that "the fact that Der Hagopian informed Hanson that the judge would be notified about the conversation affected Hanson's ability to serve as an impartial juror for fear of reprimand from the Court." There is no factual basis for this speculation on the part of appellants. The Public Defender was fulfilling his obligation to terminate the conversation once he learned Mr. Hanson's identity and to tell Hanson that he had to inform the Court of the conversation. There obviously was no "reprisal" from the Court, which did not learn of the contact until later because of Der Hagopian's belief that Hanson was a juror in a state court case then going on at the same time with similar facts. The notion that Hanson feared reprisal from the Court is speculation.

 Appellants argue that the District Court erred in allowing testimony at the post-trial hearing indicating that Hanson did not share the information with any other juror. The trial court is granted broad discretion in determining the type of investigation conducted. *United States v. Boylan,* 898 F.2d 230, 259 (1st Cir.), *cert. denied,* 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990). Courts should not subject jurors to undue impositions. *United States v. Ianniello,* 866 F.2d 540, 544 (2nd Cir.1989). In its June 3, 1994 Order denying the motion for a new trial, the District Court did not place any substantial reliance upon the question of whether Hanson communicated his contact to other jurors, although the Court did note in passing that "Mr. Hanson did not communicate any information he received from Mr. Der Hagopian." However, the heart of the District Court's decision clearly focused upon the conclusion that Hanson's contact concerned a question about search warrant procedures that was obviously not at issue in the trial. Appellant contends that on appeal, this Court should have been given a record that did not demonstrate whether the contact was communicated to other jurors, and then "this Court could determine whether there was any potential invidious effect of that information, based upon the information itself rather than whether it was shared." This argument is without merit. The District Court *did* focus on the "information itself rather than whether it was shared," and it found that the information concerned an irrelevancy. This Court finds that even if the information had

been shared, it would have been harmless to the defendants. The District Court was correct in denying the motion for a new trial based on the juror misconduct issue.

The convictions of Richard Estrada and Daniel Dossett are affirmed.