# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

---

No. 97-3959

---

United States of America,

        Appellee,

        v.

Rene Madrid,

        Appellant.

Appeal from the United States
District Court for the
Northern District of Iowa.

---

Submitted: June 9, 1998

Filed: August 26, 1998

---

Before LOKEN, GODBOLD,[1] and HEANEY, Circuit Judges.

---

HEANEY, Circuit Judge.

Rene Madrid appeals his drug convictions, arguing that evidence seized from his house was the fruit of an illegal search and was improperly received under the inevitable discovery doctrine. Because we decline to extend the inevitable discovery doctrine to the facts of this case, we reverse and remand for a new trial.

---

[1]The Honorable John C. Godbold, United States Circuit Judge for the Eleventh Circuit Court of Appeals, sitting by designation.

# I.

On August 9, 1996, the Drug Enforcement Agency, the Federal Bureau of Investigation, the Mid-Iowa Drug Task Force, and local law enforcement agencies prepared for the delivery of a kilogram each of methamphetamine and cocaine by Arturo Martinez to Special Agent Greg Brugman. Several agents and officers maintained surveillance of the operation. Just before the delivery, agents observed Martinez stopping at Madrid's home at 505 Harmon Street in Tama, Iowa. Madrid accompanied Martinez to a convenience store, the site of the planned drug transaction. Upon their arrival, Brugman told Madrid to go to the front of the store. Martinez then delivered two pounds of methamphetamine and twenty-two ounces of cocaine to Agent Brugman.

After the drug delivery, agents and officers arrested both Madrid and Martinez at approximately 12:42 p.m. Brugman transported Martinez back to Martinez's residence, where Brugman executed a search warrant at approximately 1:15 p.m. Brugman, Martinez, and several agents and officers were at the residence until 2:30 p.m. At some point after the arrest, but before the issuance of a search warrant for Madrid's house, Martinez agreed to cooperate with the police. Martinez told police that he obtained some of the methamphetamine earlier in the day from Madrid's home, he purchased controlled substances from Madrid's home on previous occasions, and he observed two more pounds of methamphetamine at Madrid's home.[2]

At some point, Brugman anticipated obtaining a search warrant for Madrid's home. Rather than wait for the warrant, however, Brugman decided to secure Madrid's

---

[2]As the government conceded at oral argument, it is unclear from the record whether Martinez's statements were made before or after the warrantless entry into Madrid's house.

home.[3]  Captain Bill Yount of the Linn County Sheriff's office was in charge of the search at Madrid's home.  Without a warrant, approximately five to seven agents and officers entered the house at 2:15 p.m.  They knocked on the door and a 15-year-old female overnight guest answered the door.  At the suppression hearing, the guest testified that she did not believe that she had the authority to refuse their entry into the house.  Police then entered Madrid's home and performed a "security sweep" to determine whether other individuals were present.  In all, two young women, and two men were at Madrid's home.  The other young woman was Madrid's fifteen year-old stepdaughter.  The men were Madrid's brother and cousin, both of whom were Hispanic and neither of whom spoke English.  When the agents and officers entered the home, the four occupants were not free to leave.  After searching the cushions of a sofa in the living room, police officers searched the men, took their pictures, emptied their pockets into plastic bags marked "evidence," required them to sit in the living room, and did not permit them to talk to one another.  Officers ordered the young women to sit in the dining room and did not permit them to answer the phone, make phone calls, talk to one another or go to the restroom without an escort.[4]  At no time did any of the occupants give consent for the search of the house.

According to evidence offered by Madrid during his suppression hearing, before police officers obtained the search warrant, they went upstairs and to the basement two or three times, seeing two scales in "plain view," which the government later offered as evidence of drug transactions; they searched through mail and personal documents in the kitchen; and they looked though a notebook, which the government later offered as evidence of drug transactions.  Sometime between 3:15 and 3:30 p.m. and before the warrant arrived, Robin Oaxaca, Madrid's wife, returned home from work and refused to consent to the search of the house.  According to her testimony at the suppression

---

[3]The police applied for the warrant in Cedar Rapids, approximately sixty miles from Tama.  It is undisputed that the police could have obtained the warrant in Tama.

[4]The record does not reflect whether female agents were present.

hearing, Oaxaca said "[Y]ou wait for your warrant." "I'm a United States citizen, . . . . you just can't come in here and search my home and hold my children hostage." [Suppression Tr. at 165-66].

Scott French, a Cedar Rapids FBI agent who did not participate in the drug investigation, took information concerning the investigation over the telephone and prepared a search warrant for Madrid's house with the assistance of an Assistant United States Attorney (AUSA). The warrant application included information obtained from the warrantless entry into Madrid's house, namely, that a scale, scale weights, and a razor blade were "observed in plain view in the basement." The warrant application also contained the corroborating information obtained from Martinez to the effect that some of the drugs delivered to Brugman were obtained from Madrid's house and that Martinez had purchased controlled substances from Madrid's house on prior occasions. The magistrate received the warrant shortly after 4:00 p.m. and signed it at 4:20 p.m. The "official" search pursuant to the warrant commenced at 4:50 p.m.

Prior to trial, Madrid filed a motion to suppress, seeking to exclude from evidence all items obtained from the search of his house. The government argued that the exclusionary rule did not apply because exigent circumstances justified the warrantless entry and the items seized would have been inevitably discovered through independent, legal means. The magistrate and the district court, in adopting the magistrate's report and recommendation, declined to address whether exigent circumstances justified the warrantless entry, but held that the evidence would have been inevitably discovered and admitted the items into evidence. Notably, the magistrate issuing the report and recommendation was the same magistrate who originally issued the warrant.

On June 6, 1997, a jury convicted Madrid of possession with intent to distribute cocaine and methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), and conspiracy to distribute and possess with intent to distribute cocaine and methamphetamine in

violation of 21 U.S.C. § 846. On September 25, 1997, the district court denied Madrid's motion for judgment of acquittal or for a new trial.

At sentencing on October 27, 1997, the district court calculated Madrid's base offense level at 32 under U.S.S.G. § 2D1.1 due to his involvement with over 100 grams of methamphetamine. The court imposed a two-level enhancement for obstruction of justice due to perjury committed at trial in the form of Madrid's denial of knowledge of the drug activity. Madrid's adjusted offense level was 34 and his criminal history category was I, resulting in a sentencing range of 151-188 months. The district court sentenced Madrid to 151 months of imprisonment, a $200 special assessment, and five years supervised release.

On appeal, Madrid argues that the trial court erred by (1) denying his motion to suppress evidence; (2) admitting certain evidence; (3) denying his motion for judgment of acquittal or a new trial; (4) assessing certain quantities of drugs to him at sentencing; (5) granting a two-level enhancement for perjury and denying safety valve credits and a minor role adjustment; and (6) denying his pro se motions challenging jurisdiction.

## II.

"This Court will affirm the District Court's order denying the motion to suppress unless we find that the decision is unsupported by the evidence, based on an erroneous view of the law, or the Court is left with a firm conviction that a mistake has been made." United States v. Estrada, 45 F.3d 1215, 1217-18 (8th Cir. 1995); see also Ornelas v. United States, 517 U.S. 690, 699 (1996); United States v. Ball, 90 F.3d 260, 262 (8th Cir. 1996).

The Fourth Amendment protects an individual's reasonable expectation of privacy from unauthorized intrusion. See Katz v. United States, 389 U.S. 347, 360

5

(1967) (Harlan, J., concurring). Where an individual possesses a reasonable expectation of privacy--such as in his home--the government must generally obtain a warrant before conducting a search. The United States Supreme Court has stated: "Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment--subject only to a few specifically established and well-delineated exceptions." Horton v. California, 496 U.S. 128, 133 n.4 (1990) (quoting Katz, 389 U.S. at 357). It is quite clear in this case that the initial entry, seizure, and search of Madrid's house was conducted outside the judicial process and was, therefore, per se unreasonable unless the government is able to show that an exception applies.

"[T]he Fourth Amendment has drawn a firm line at the entrance to the house," Payton v. New York, 445 U.S. 573, 590 (1980), and it "is designed to prevent, not simply to redress, unlawful police action." Chimel v. California, 395 U.S. 752, 766 n.12 (1969). Consequently, unless the government can show that the warrantless search was permissible under an exception to the Fourth Amendment's warrant requirement, see Carter v. United States, 729 F.2d 935, 940 (8th Cir. 1984), the exclusionary rule would bar the admission of evidence obtained from the warrantless search. See Mapp v. Ohio, 367 U.S. 643, 648 (1961) (citation omitted); Weeks v. United States, 232 U.S. 383, 398 (1914). The district court declined to determine whether exigent circumstances validated the warrantless search of Madrid's home. Thus, for purposes of this appeal, we assume that exigent circumstances did not exist and limit our inquiry to whether the court properly admitted the challenged evidence under the inevitable discovery doctrine.

The inevitable discovery doctrine is based on the concept that illegally obtained evidence that is sufficiently purged of its original taint is not subject to the exclusionary rule. See Wong Sun v. United States, 371 U.S. 471, 488 (1963); Nardone v. United States, 308 U.S. 338, 341 (1939); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392 (1920). The precarious balance struck by the Fourth Amendment's warrant

6

requirement and the inevitable discovery doctrine recognizes that, while the exclusion of illegally obtained evidence both deters police officers from violating constitutional protections and prevents prosecutors from benefitting from the illegality, evidence that would have been inevitably discovered through independent, lawful means should be admitted so that the prosecutor is put in the same, not worse, position as though the original illegality had not occurred.  See Nix v. Williams, 467 U.S. 431, 442-43 (1984). In setting forth the government's obligations under the inevitable discovery doctrine, we have stated that:

> [T]he government must prove by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation.

United States v. Conner, 127 F.3d 663, 667 (8th Cir. 1997) (citation omitted).

The magistrate determined that the inevitable discovery doctrine applied to the facts of this case, thereby extending the principles enunciated in Segura v. United States, 468 U.S. 796 (1984), and Murray v. United States, 487 U.S. 533 (1988).  We disagree.

In Segura, agents sought authorization from an AUSA to arrest Colon and Segura on the basis of a tip and information obtained from surveillance.  See 468 U.S. at 799-800.  Due to the late hour and the presumed inability to obtain a search warrant until the following day, the AUSA suggested that the agents secure Segura's apartment to prevent the destruction of evidence.  See id. at 800.  At 11:15, Segura entered the lobby of his apartment building alone and was arrested.  See id.  Agents then took him to his third floor apartment where they knocked on the door.  See id.  Colon answered the door and the agents entered without asking for, or receiving, permission.  See id.  The agents arrested Segura and Colon along with three other occupants of the apartment

7

and took them to DEA headquarters.  See id.  Prior to obtaining a search warrant, agents conducted a limited security check to determine whether anyone else who might pose a threat was in the apartment.  See id. at 800-01.  During the check, agents observed in plain view but did not disturb evidence of drug trafficking.  See id. at 801.  After receiving the search warrant, agents found and seized almost three pounds of cocaine, ammunition, more than $50,000, and records of drug transactions.  See id.  None of these items were observed before the warrant was issued.

The defendants moved to suppress all evidence seized from the apartment.  See id.  The district court held that no exigent circumstances supported the initial entry and suppressed the items observed in plain view during the illegal search.  See id. at 802.  The district court also suppressed the items seized pursuant to the warrant because the agents would not necessarily have discovered them absent the illegal entry.  See id.  The Sixth Circuit upheld the finding of no exigent circumstances and the suppression of items observed in plain view during the illegal search.  See id.  However, the Sixth Circuit reversed, holding that items not observed during the initial, illegal search, but discovered pursuant to a valid warrant, should not be suppressed.  See id.  Because the government did not pursue its argument that exigent circumstances validated the warrantless search, the narrow question before the Supreme Court was whether items seized from Segura's apartment pursuant to a valid warrant[5] were admissible.  See id. at 804.  The Supreme Court affirmed the Sixth Circuit because

> [n]one of the information on which the warrant was secured was derived from or related in any way to the initial entry into petitioners' apartment; the information came from sources wholly unconnected with the entry and was known to the agents well before the initial entry.  No information obtained during the initial entry or occupation of the apartment was needed or used by the agents to secure the warrant.  It is therefore beyond

---

[5]It would appear from the Court's opinion that the defendants conceded the validity of the warrant.

dispute that the information possessed by the agents before they entered the apartment constituted an independent source for the discovery and seizure of the evidence now challenged.

Segura, 468 U.S. at 814.

In Murray, agents observed Murray drive a truck and Carter drive a green camper into a warehouse. See 487 U.S. at 535. When Murray and Carter drove their respective vehicles out of the warehouse twenty minutes later, agents saw two individuals and a tractor-trailer rig inside the warehouse. See id. Murray and Carter later turned over their vehicles to new drivers, and when the vehicles were lawfully seized, agents found that they contained marijuana. See id. After seizing the marijuana, agents forced entry into the warehouse. See id. They did not have a warrant, and the agents observed in plain view burlap bales that were later found to contain marijuana. See id. The agents left without disturbing the bales, kept the warehouse under surveillance, and did not reenter until they obtained a search warrant. See id. The warrant application did not mention the prior, illegal entry nor did the agents rely on observations made during the entry. See id. at 536. Following the issuance of the warrant, agents seized 270 bales of marijuana and notebooks listing customers to whom the bales were destined to be shipped. See id.

Defendants moved to suppress the bales of marijuana, the district court denied the motion, and the First Circuit affirmed. See id. The Supreme Court, noting that the inevitable discovery doctrine is an extrapolation of the independent source doctrine, determined that the "ultimate question" was "whether the search pursuant to the warrant was in fact a genuinely independent source of the information and tangible evidence." Id. According to Murray, the court answers that question in the negative if "the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." Id. at 542 (footnote

omitted). The Supreme Court remanded the case for further findings to determine whether the warrant-authorized search of the warehouse was an independent source of the challenged evidence. See id. at 543-44.

In this case, Madrid was nowhere near his home when agents arrested him, and no finding of exigent circumstances justified the warrantless entry, seizure, and search of his home. Prior to receiving the warrant, officers and agents detained five occupants, searched mail and a notebook, and wandered through Madrid's house. Because they simultaneously applied for a warrant, we must conclude that the decision to seek the warrant was unaffected by what officers observed at Madrid's house. The affidavit supporting the warrant, however, contained information obtained from the illegal entry, seizure, and search of Madrid's home.

In determining that the decision to issue the warrant was unaffected by the illegally obtained information, the same magistrate who issued the initial warrant concluded that a warrant, based in part on illegally obtained information, should be upheld if after excising the illegal information from the warrant application under a Franks theory,[6] the remaining legally obtained information supports probable cause. See United States v. Madrid, No. 96-0024, Report and Recommendation at 9-10 (N.D. Iowa Jan. 3, 1997) (citing Franks v. Delaware, 438 U.S. 154 (1978)). The magistrate then concluded that:

> This court knows for certain that it would have issued the warrant without
> the evidence gathered while the agents secured the residence from within.
> As noted in the warrant, the police had observed Arturo Martinez coming

---

[6]In Franks, the Supreme Court held that, when evaluating whether a warrant application containing the false statements of an affiant is supported by probable cause, the appropriate course is to strike the offending statements, and if the remaining truthful statements support probable cause, the warrant will be upheld. See Franks v. Delaware, 438 U.S. 154, 171-72 (1978) (footnote omitted).

10

from the Madrid residence immediately prior to delivering drugs to Agent Brugman. Second, upon his arrest, Arturo Martinez cooperated with the police and informed them that he got controlled substances for the transaction at the Madrid residence and further stated that additional controlled substances were still at the residence. Thus, the police had direct, first-hand information corroborating their reasonable belief that drugs were present at the Madrid residence.

Madrid, No. 96-0024, Report and Recommendation at 10.

As a preliminary matter, we express some concerns about whether the warrant was supported by probable cause and whether the decision to grant the warrant was unaffected by illegally obtained information. The magistrate determined that, by excising illegally obtained information from the warrant application, the remaining legally obtained information supports probable cause. Without deciding the matter, we assume for the purposes of this appeal that the magistrate's Franks-based approach is also the appropriate method for determining whether the decision to issue the warrant was unaffected by the illegally obtained information.[7] While the magistrate may have therefore properly ignored references to the scale, scale weights, and razor blade as illegally obtained information, because the record is unclear, we are not convinced that the magistrate was entitled to rely on Martinez's comments to validate the warrant.[8]

---

[7]It is clear that a Franks analysis is the proper method for determining whether a warrant is supported by probable cause. See Estrada, 45 F.3d at 1219 (citations omitted). While probable cause is necessary, we are uncertain whether it is sufficient or possible to show that the decision to issue the warrant was unaffected by the illegally obtained information as required by Murray.

[8]The magistrate would have issued the warrant notwithstanding the illegally obtained information in part because Martinez told the police that he got the drugs from Madrid's house and that more drugs were still there. After carefully reviewing the record, we are unable to determine whether Martinez's statements were obtained before the illegal search of Madrid's house. See Segura, 468 U.S. at 814; United States v. Beck, 662 F.2d 527, 530 (8th Cir. 1981) (permitting evidence gained

Consequently, we are not convinced that the warrant was supported by probable cause or that the decision to issue the warrant was unaffected by the illegally obtained information. Notwithstanding these doubts, however, we cannot extend the application of the inevitable discovery doctrine to the facts of this case.

After carefully reviewing the record, we conclude that there is "evidence that the agents . . . exploited their presence" in Madrid's house. Segura, 468 U.S. at 812 (plurality opinion). Far from simply securing the residence, evidence submitted at the suppression hearing indicates that officers went upstairs and downstairs on two or three occasions, detained and searched the occupants, seized wallets and placed them in envelopes marked "evidence," and leafed through personal mail and a notebook. Under these circumstances, the Fourth Amendment's warrant requirement can effectively serve its deterrent function only if police officers may not constitutionally search a residence, hold its occupants hostage, and, in short, exploit their presence simply because the warrant application process has begun.[9] Whatever balance is to be

_____

subsequent to illegal search where after-acquired warrant was based on evidence gathered prior to illegal search). If the statements were obtained after the illegal entry into Madrid's home, the analysis is necessarily different. The record shows that several officers were involved in investigating both Madrid's and Martinez's residences. Some of these officers came and went from each location. This raises strong concerns regarding the independence of the investigation supporting the warrant. We are reluctant, however, to create a per se rule which would bar statements or evidence obtained after an illegal entry into a defendant's house. Consequently, while we are far less confident than the magistrate that the warrant was validly issued, we do not decide the matter because we decline to extend the inevitable discovery doctrine to the facts of this case.

[9]We note that in Murray, the Supreme Court stated:

An officer with probable cause sufficient to obtain a search warrant would be foolish to enter the premises first in an unlawful manner. By doing so, he would risk suppression of all evidence on the premises, both seen and

achieved by the inevitable discovery doctrine, it cannot be that police officers may violate constitutional rights the moment they have probable cause to obtain a search warrant.

The government's intrusion in this case far exceeds that in either Segura or Murray, and we do not read those cases as requiring the application of the inevitable discovery doctrine without regard to the severity of the police misconduct. In fact, the only way we can effectuate the warrant requirement's deterrent function is to decline to extend the application of the inevitable discovery to the facts of this case. Unlike the present case, Segura and Murray involved warrant applications that were significantly less tainted by illegally obtained information. In Segura, for example, none of the information supporting the warrant arose from or was related to the illegal entry, and all of the information came from independent sources that were wholly unconnected with the illegal entry. See Segura, 468 U.S. at 814. Further, the agents detained no occupants while they sought the warrant, and the defendants conceded the validity of the subsequently issued warrant. Similarly, the agents in Murray did not disclose their illegal entry to the issuing magistrate nor did they include any information obtained from the illegal entry in their warrant application. See Murray, 487 U.S. at 543.

---

> unseen, since his action would add to the normal burden of convincing a magistrate that there is probable cause the much more onerous burden of convincing a trial court that no information gained from the illegal entry affected either the law enforcement officers' decision to seek a warrant or the magistrate's decision to grant it.

Murray 487 U.S. at 540. We agree with the Court that requiring the government to prove that no information gained from the illegal entry affected the decision to obtain or grant the warrant may generally be a sufficient deterrent to effectuate the proper balance under the Fourth Amendment. We cannot agree with the government's position at oral argument, however, that the inevitable discovery doctrine bars application of the exclusionary rule under any and all circumstances in which the police had probable cause to obtain a search warrant.

13

Moreover, the agents did not disturb the evidence, nor did they remain on the premises while agents obtained the warrant. The offensiveness of the officers' actions in this case, by contrast, is not limited to the seizure of premises, but extends to the detention of occupants and the continued, prolonged, illegal search by wandering officers.

Recognizing that the inevitable discovery doctrine is designed, at least in part, to place the prosecution in no worse of a position for the illegal acts of police officers, we simply cannot grant police officers carte blanche to trample constitutional rights whenever they might have probable cause to obtain a search warrant and thereby placing them in a better position because of their illegal acts. As Chief Justice Burger stated:

> [S]ecuring a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents. We reaffirm at the same time, however, that, absent exigent circumstances, a warrantless search . . . is illegal.

Segura, 468 U.S. at 810 (plurality opinion).

Accordingly, we hold that absent exigent circumstances, the inevitable discovery doctrine is inapplicable to a warrantless search when police officers exploit their presence in the home as they did in this case. Our holding ensures that the balance achieved by the inevitable discovery doctrine preserves the warrant requirement's deterrent function. If we were to extend the doctrine to the facts of this case, the warrant requirement would become the warrant application requirement, thereby enabling police officers to take shortcuts clearly prohibited by the Fourth Amendment. The warrant requirement must mean something, and we cannot allow the exception to swallow the rule.

Because we reverse the district court as to the suppression of evidence and remand for a new trial, we need not address Madrid's remaining arguments.

### III.

For the reasons stated above, we reverse the district court and remand for a new trial.

A true copy.

      Attest.

           CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.