**UNITED STATES of America,**
**Plaintiff,**

**v.**

**James PRATHER, Defendant.**

**1:15–cr–0030**

United States District Court,
S.D. Iowa, Western Division.

Signed October 14, 2015

Katherine Ann McNamara, United States Attorney's Office, Council Bluffs, IA, for Plaintiff.

Michael Lee Smart, Federal Public Defender's Office, Sioux City, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PRATT, District Judge, UNITED STATES DISTRICT COURT

### I. PROCEDURAL BACKGROUND

Before the Court is James Prather's ("Defendant") Motion to Suppress Evidence, filed September 3, 2015. Clerk's No. 22. The government filed a resistance to the Motion on September 9, 2015. Clerk's No. 24. The Court held a hearing on the Motion on September 14, 2015.[1] Clerk's No. 25. The matter is fully submitted.

### II. FACTUAL BACKGROUND

On June 19, 2015, United States Magistrate Judge Celeste Bremer authorized a search warrant for Defendant's residence in Carter Lake, Iowa. *See* Def.'s Ex. B. The only item the warrant authorized for seizure was an approximately 2 inch by 4 inch I–551 Stamp. *See id.* About an hour-and-a-half after the warrant was issued, Homeland Security Investigations Special Agent Andrew Stewart ("Agent Stewart") assisted the Federal Protective Service ("FPS") and local authorities in executing the warrant. *See* Hr'g Tr. at 3–4. Prior to commencing the search, Agent Stewart read the warrant and its attachments, viewed photographs of the I–551 Stamp, and was briefed on additional pertinent information. *Id.* at 5–7. In particular, FPS advised Agent Stewart that "they had obtained [information] that the owner of the residence has numerous firearms at the residence and one firearm was potentially defaced." *Id.* at 7.

Law enforcement were admitted to Defendant's residence by a property manager because neither Defendant nor anyone else was home at the time the warrant was executed. *Id.* Agent Stewart immediately searched the living room and kitchen areas of the home, but did not locate the I–551 Stamp. *Id.* at 7–8. Agent Stewart then proceeded down the hallway to the master bedroom and began searching inside the room's walk-in closet.[2] *Id.* at 8. On a shelf in the closet, Agent Stewart located a black box for an Xbox gaming system that was approximately one foot by one foot in size. *Id.* at 10. Because the box was large enough to contain the I–551 Stamp, Agent Stewart removed it from the shelf and opened it. *Id.* He immediately saw a Smith & Wesson firearm. *Id.* There was also some loose paperwork in the box. *Id.*

Agent Stewart testified that he was trained that when a firearm is located during a search, he should "call it out to let everyone know that we're dealing with a firearm and then to clear [the firearm] and make it safe." *Id.* at 10–11. Thus, after yelling out to other law enforcement that he had found a weapon, Agent Stewart "picked [the firearm] up ... released the magazine, put it to the side, locked the slide to the rear, flipped it over, checked again[3] and said, 'hey, the firearm is safe

---

1. All citations to the Hearing Transcript refer to the an unedited version of the transcript provided to the Court by the court reporter.

2. Two other law enforcement officers were also searching in the master bedroom area at the time Agent Stewart searched the walk-in closet. Hr'g Tr. at 8–9.

3. Agent Stewart testified that he was trained to "check [a firearm] twice" to ensure that it is not loaded. Hr'g Tr. at 11–13.

and clear,' and then placed it back in the box." *Id.* at 13. Agent Stewart additionally testified that "[a]s soon as [he] picked [the firearm] up and released the magazine," he noticed that "[o]n the underneath portion of the firearm, there's an area that's generally where a serial number is identified for the gun and it was missing." *Id.* Specifically, Agent Stewart observed a hole that was "approximately an inch long, maybe a quarter of an inch wide, right in the middle of the bottom of the frame." *Id.* Agent Stewart further testified as follows:

Q. Agent Stewart, when you noticed the hole in the firearm that you described, that you testified should have contained a metal plate with a serial number, did you then kind of look at the firearm further to see if there was any serial numbers on any other places on the firearm?

A. Yes. Generally speaking on a pistol, there's a couple of places that a serial number could be found. That's one of them. And then on the side, the rail on both sides, I looked at both sides and could not find one.

Q. And would you have been able to— if there was a firearm [sic] in that place that you described, would you have been able to see those serial numbers when you pulled back the firearm in order to check to see if it was loaded?

A. Generally it's right on the side, you can see it without manipulating it.

Q. Now, in order to view the hole as you described earlier on the firearm that should have contained that metal plate, did you have to manipulate the firearm in any way to see that, or were you able to see it as you were unloading the firearm?

A. I could see it immediately.

Hr'g Tr. at 14–15. Agent Stewart testified that after the firearm with the missing serial number was discovered, several other firearms were located in Defendant's residence and each was unloaded and made safe in the same manner. *Id.* at 15. Only the firearm with the missing serial number was seized, however, because none of the other firearms were considered illegal to possess. *Id.* at 16.

Agent Stewart acknowledged on cross-examination that the only people present in the residence during the execution of the search warrant were law enforcement personnel, though he later emphasized that the presence or absence of civilians would have made no difference. *Id.* at 17, 23–24 (Q. "So you would have, based on your training and experience, picked up that firearm even if it's just law enforcement present?" A. "Irregardless, I would have cleared it, made it safe, correct."). He also admitted that there was no I-551 Stamp observable anywhere near the firearm in the Xbox box, and that he only picked the firearm up to "make sure for myself and for my fellow officers that it's clear and safe." *Id.* at 18–19. He further agreed that modern firearms, like the one seized, "have safety mechanisms so that the triggers don't accidentally discharge" and that "firearms just simply don't discharge by themselves." *Id.* at 18.

Regarding the serial number, Defendant's counsel and Agent Stewart engaged in the following colloquy:

Q. I'll ask you, sir, if you could hold that [seized gun] up and just demonstrate for us where serial numbers might appear on a Smith & Wesson 40?

A. Well, generally on pistols, like I say, I'm not intimately familiar with Smith & Wesson 40s, but ... generally pistols right here (indicating) on the slide, on other side, generally

there's a serial number, and on this sometimes they can be on the bottom.

Q. Okay. So sometimes they can be on the bottom or either side?

A. Or either side.

Q. So, sir, to determine whether or not the item, Exhibit 1, had a serial number on it or not, you would have to pick it up and manipulate it and examine it more carefully, wouldn't you?

A. Yes.

Q. So you said you first noticed there was a plate missing on the bottom, so then you examined either side to see if there was a serial number there, correct?

A. Correct.[4]

Q. And you had previously had information from another source that there could possibly be a firearm in there without a serial number?

A. Yes.

Q. Were you aware of that when you were examining Exhibit 1?

A. Yes.

Q. So at the time that you went in the apartment in question, was it your intention that if you discovered any weapons, firearms, that you would clear the firearms and then, assuming you had the ability to do so, run an NCIC check on them?

A. Yes.

Q. And, in fact, that's what you did?

A. Yes.

. . .

Q. Just to be clear, Special Agent, without picking up and manipulating that firearm, you wouldn't know if there was a serial number on it or not, would you?

A. No.

Hr'g Tr. at 21–24.

### III. LAW AND ANALYSIS

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Here, Defendant does not contest the issuance of the search warrant or the legality of the search itself. See Clerk's No. 22–1. Rather, he contends that the firearm and all evidence related to it must be suppressed because law enforcement exceeded the scope of the warrant when they seized the firearm, which was not specifically identified in the warrant. Id. In this situation, the Government bears the burden to demonstrate that an exception to the warrant requirement is applicable. See United States v. Clay, 579 F.3d 919, 932 (8th Cir.2009) ("If an item not particularly described in the warrant is seized, it must fall within an exception to the Fourth Amendment's warrant requirement."). To this end, the Government argues that the firearm was properly seized for officer safety concerns and pursuant to the plain view doctrine. See Clerk's No. 24. The Government alternatively argues that law enforcement had sufficient information to obtain a warrant for the firearm, such that the inevitable discovery doctrine applies.

4. See also Hr'g Tr. at 22–23 (redirect examination: Q. "[Y]ou didn't have to examine carefully the firearm in order to view the hole where the metal plate should have been, correct?" A. "Correct." Q. "You noticed that as you testified right away when you unloaded the gun?" A. "Yes, as soon as I brought it up to release the magazine." Q. "And it was only after you noticed that the metal plate was missing that you looked for additional serial numbers, correct?" A. "Correct.").

### A. *Plain View Doctrine & Officer Safety*

The plain view doctrine permits an officer to "seize an object in plain view provided the officer is lawfully in the position from which he or she views the object, the object's incriminating nature is immediately apparent, and the officer has a lawful right of access to the object." *United States v. Hastings*, 685 F.3d 724, 729 (8th Cir.2012) (quoting *United States v. Darr*, 661 F.3d 375, 379 (8th Cir.2011)). There is no dispute that Agent Stewart had a lawful right of access to the firearm at the time he first observed it. He was acting pursuant to a valid search warrant and the Xbox box reasonably could have contained the I–551 Stamp he was searching for. Had Agent Stewart then recognized, without picking up the firearm, that it had an obliterated serial number, the case would unquestionably fall within the plain view doctrine.[5] As is often the case, however, the situation here is more nuanced. Agent Stewart did not observe the hole where the firearm's serial number typically would have appeared until he picked up the firearm. Moreover, the record is clear that Agent Stewart's sole purpose in picking up the firearm was to secure it, and not to further his search for the I–551 Stamp. *See* Hr'g Tr. at 18 (Q. "Did you see a stamp anywhere near that firearm?" A. "No." Q. "And so the reason you picked the firearm us was then to, as you said, make it safe, correct?" A. "Cor-

rect."); *Arizona v. Hicks*, 480 U.S. 321, 325, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) (finding that a search must be " 'strictly circumscribed by the exigencies which justify its initiation' " unless another exception to the warrant requirement justifies further intrusion (quoting *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978))). Thus, the pertinent questions are: (1) was Agent Stewart legally justified in picking up the firearm in order to secure it, thereby placing him lawfully in a position to view the hole in the firearm where the serial number might have been; and (2) if so, was the incriminating nature of the firearm "immediately apparent" since the serial number could have been located in areas of the firearm other than where the hole was observed.

To answer the first question, the Court must determine whether it was reasonable under the Fourth Amendment for Agent Stewart to pick up the firearm in order to "secure it." *See Brigham City, Utah v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) (stating that the "ultimate touchstone of the Fourth Amendment is 'reasonableness' " (citations omitted)). The Government urges that Eighth Circuit precedent warrants a conclusion that Agent Stewart's handling of the firearm in this case was reasonable because it was done in the interest of officer safety. Clerk's No. 24. In particu-

---

5. The Government did not present any testimony that the hole in the firearm (or any other evidence indicating an altered serial number) was, or even *could have been*, *visible* while the firearm was still in the Xbox box. *See generally* Hr'g Tr. Indeed, Officer Stewart admitted on cross-examination that, "without picking up and manipulating that firearm, [he] wouldn't know if there was a serial number on it or not." *Id.* at 24. Given this record, the Court cannot conclude that the incriminating nature of the firearm was "immediately apparent" while it was resting in the Xbox box. *See Minnesota v. Dickerson*,

508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) ("[I]f police are lawfully in a position from which they view an object, and its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant. If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object—*i.e.*, if its incriminating character [is not] immediately apparent—the plain-view doctrine cannot justify its seizure." (internal quotation marks and citations omitted)).

lar, the Government cites *United States v. Arcobasso,* 882 F.2d 1304, 1307 (8th Cir. 1989), and *United States v. Robinson,* 756 F.2d 56, 60 (8th Cir.1985)), which both rely on *United States v. Malachesen,* 597 F.2d 1232, 1233 (8th Cir.1979).

In *Malachesen,* law enforcement officers were executing a warrant of Malachesen's home for a snowmobile and marijuana. 597 F.2d at 1233. During the course of the search, they discovered a cocked and loaded .22 caliber revolver under a mattress, and observed a bullet hole in the wall nearby. *Id.* Pursuant to standard police procedure and motivated by safety considerations, one of the officers picked up the weapon, uncocked and unloaded it, and turned it over to an inventory officer. *Id.* at 1233 & n. 1. While the search continued, officers were informed that Malachesen had a prior felony conviction; they then seized the revolver. *Id.* at 1233. In reversing the district court's suppression of the firearm, the Eighth Circuit held:

> Although the incriminating nature of the handgun may not have been immediately apparent to the investigating officers, its temporary seizure, unloading, and retention by a responsible officer (here the inventory officer) seems a reasonable precaution to assure the safety of all persons on the premises during the search. *United States v. Chapman,* 549 F.2d 1075 (6th Cir.1977). A loaded, cocked handgun poses a threat to anyone within is range of fire. Moreover, temporary seizure undercuts the chance of mishap the accidental discharge of the handgun through mishandling by someone on the premises, or even its intentional use by Malachesen's roommate [who was present during the search] or a cohort. Common sense dictates that the weapon should be unloaded and, at least temporarily, kept in a safe place. When the officers learned that Malachesen had a prior conviction, the tempo-

rarily-seized handgun became contraband and subject to seizure as an illegal weapon possessed by a felon.

*Id.* at 1234.

In *Robinson,* police executing a warrant at Robinson's residence noticed that Robinson had something in his hand and ordered him to drop it. 756 F.2d at 57. Robinson dropped a .25 caliber pistol, which an officer unloaded and then retained upon finding information during the search indicating that Robinson was on parole. *Id.* The Eighth Circuit simply cited *Malachesen* in concluding that the seizure of the firearm was permissible at all stages. *Id.*

In *Arcobasso,* officers responded to a call for shots fired and observed Arcobasso through a window "dry-firing" a gun. 882 F.2d at 1305. Arcobasso told officers that a person named "Rick" was inside the home. *Id.* Concerned that Rick might be injured, or that Rick or other unidentified individuals might pose a threat to officer safety, law enforcement entered the home and unloaded and seized weapons observed in plain view. *Id.* at 1305–06. The Eighth Circuit found the seizure did not violate the Fourth Amendment because "the weapons were properly unloaded and seized as a precaution to assure [officer] safety and that of any other individual who might have been present." *Id.* at 1307.

█ *Malachesen, Robinson,* and *Arcobasso* do not directly discuss the well-established principle that "a search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.'" *United States v. Antwine,* 873 F.2d 1144, 1146 (8th Cir. 1989) (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 474–75, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)). Nonetheless, it is

clear that exigent circumstances—which "exist where law enforcement officers have a 'legitimate concern for the safety of themselves or others' "—is precisely what excused the seizure of firearms in each case from the Fourth Amendment's warrant requirement. *United States v. Kuenstler,* 325 F.3d 1015, 1021 (8th Cir.2003) (quoting *United States v. Vance,* 53 F.3d 220, 222 (8th Cir.1995)). Indeed, in each case, officers were objectively concerned for their own safety or for the safety of others due to the fact that non-law enforcement persons were present on the scene, creating a legitimate risk that unsecured firearms could be used improperly to inflict harm. *See Malachesen,* 597 F.2d at 1235 (presence of Malachesen's roommate); *Robinson,* 756 F.3d at 58 (presence of several people during the search, one of whom was actually holding the weapon in his hand when officers entered); *Arcobasso,* 882 F.2d at 1306 (presence of person or persons in house who could have posed a danger to officer safety). As well, in *Malachesen,* an additional exigency existed based on the fact that the firearm was not only loaded, but cocked, creating a significant risk of accidental injury to persons on the scene. *Malachesen,* 597 F.2d at 1234–35.

The present case is markedly different from *Malachesen, Robinson,* and *Arcobasso.* Here, no civilians were present during law enforcement's execution of the warrant at Defendant's residence. Hr'g Tr. at 11 ("Now, during the execution of this warrant, there weren't any other citizens present at the apartment, correct?" A. "No." Q. "There was just law enforcement?" A. "Just law enforcement."). Moreover, Agent Stewart did not testify that the gun posed some unusual or obvious risk, like the loaded and cocked gun in *Malachesen.* In fact, he admitted that the firearm was a modern gun with safety mechanisms designed to avoid accidental discharge. *Id.* at 18. Agent Stewart further admitted

that he had no knowledge that the gun could have somehow discharged if he had simply left it in the Xbox box. *Id.* at 18. In short, Agent Stewart did not identify *any* specific danger posed to law enforcement by the mere presence of the firearm; rather, he testified that he picked up the firearm and secured it simply because he was trained that he should do so to ensure the safety of other officers and citizens who may be nearby. *Id.* (Q. "Why did you [pick the firearm up out of the box]?" A. "It's our general principle when we identify a firearm in a search [ ], we call it out to let everyone know that we're dealing with a firearm and then to clear and make it safe" ... Q. "[B]ased on your training and experience, you are trained that when you see a firearm during the execution of a warrant, you're supposed to make that firearm safe?" A. "That's correct.").

The Court does not doubt that there is wisdom in teaching law enforcement officers to secure any weapon they encounter during the course of a search. Wisdom, however, is an insufficient foundation upon which to establish a blanket rule authorizing law enforcement to seize and secure all weapons during a search with no consideration of the surrounding circumstances. *See Richards v. Wisconsin,* 520 U.S. 385, 393–94, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997) ("If a *per se* exception were allowed for each category of criminal investigation that included a considerable-albeit-hypothetical-risk of danger to officers ... the Fourth Amendment's reasonableness requirement would be meaningless."). Absent such a blanket exception to the warrant requirement, general Fourth Amendment principles dictate "that exigency ... must be determined case by case based on the totality of the circumstances." *Missouri v. McNeely,* —— U.S. ——, 133 S.Ct. 1552, 1556, 185 L.Ed.2d 696 (2013). Here, Agent Stewart

provided no testimony whatsoever supporting a belief that his temporary seizure of the firearm in the Xbox box was necessary to avoid a specific, actual, imminent, or even possible risk to other officers on the scene. *See United States v. Bishop,* 338 F.3d 623, 628 (6th Cir.2003) ("[F]or the seizure of a gun in plain view (and which is not obvious contraband) to be reasonable under the Fourth Amendment, a police officer must reasonably believe, *based on specific and articulable facts,* that the weapon posed an immediate danger to officer or public safety." (emphasis added)); *see also United States v. Rodriguez,* 601 F.3d 402, 408 (5th Cir.2010) (upholding temporary seizure of firearm for security purposes where the specific circumstances of the situation made it plausible that someone could access the firearm and use it against police); *United States v. Newsome,* 475 F.3d 1221, 1226 (11th Cir.2007) (finding that the warrantless seizure of a gun is objectively reasonable "when there is a real concern for the safety of the officers present or the public at large" (citing *New York v. Quarles,* 467 U.S. 649, 653 n. 3, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984))); *United States v. Legg,* 18 F.3d 240, 245 (4th Cir.1994) (upholding the seizure of a firearm during a search on the basis that "the loaded pistol posed a threat to the safety of those executing the search warrant, particularly when family members of Legg were present, one of whom insisted on walking around the apartment while the deputies conducted the search."); *United States v. Antwine,* 873 F.2d 1144, 1146 (8th Cir.1989) (recognizing that "a warrantless seizure of a weapon may be considered 'reasonable' within the meaning of the Fourth Amendment when justified by an officer's legitimate concern for someone's safety" (citing *Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550)). Absent such testimony, the Court simply cannot conclude on this record that " 'the exigencies of the situation' ma[d]e the needs of law enforcement so compelling that the warrantless [seizure] is objectively reasonable under the Fourth Amendment." *Kentucky v. King,* 563 U.S. 452, 452, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011) (quoting *Mincey,* 437 U.S. at 393, 98 S.Ct. 2408). Since no exigency authorized Agent Stewart to pick up the weapon and secure it, and since Agent Stewart did not observe anything incriminating about the firearm until *after* he picked it up, Defendant's motion to suppress the firearm must be granted.[6]

**B. Inevitable Discovery**

The government also contends that the firearm seized from Defendant's home should be admitted under the inevitable discovery doctrine. "The inevitable discovery doctrine is based on the concept that illegally obtained evidence that is suf-

---

**6.** If Agent Stewart had been warranted in picking up the firearm to secure it, the Court would need to determine whether the incriminating nature of the firearm then became "immediately apparent." Although not necessary in light of the Court's analysis in § III.A, the Court believes it did. "The 'immediately apparent' standard does not require that a 'police officer know that certain items are contraband or evidence of a crime.' Rather, it requires 'probable cause to associate the property with criminal activity.' " *United States v. Garner,* 907 F.2d 60, 62 (8th Cir.1990) (quoting *Texas v. Brown,* 460 U.S. 730, 741–42, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (some internal quotations and citations omitted)). "Probable cause demands not that an officer be 'sure' or 'certain' but only that the facts available to a reasonably cautious man would warrant a belief 'that certain items may be contraband or stolen property or useful as evidence of a crime.' " *Id.* (quoting *Brown,* 460 U.S. at 742, 103 S.Ct. 1535). In this case, Agent Stewart's observation of a hole cut into the firearm in the typical location of a serial number plate warranted his belief that the firearm may be contraband or evidence of a crime.

ficiently purged of its original taint is not subject to the exclusionary rule." *United States v. Madrid*, 152 F.3d 1034, 1037 (8th Cir.1998) (citations omitted). The theory behind the inevitable discovery doctrine is that, while excluding illegally obtained evidence deters police misconduct and prevents prosecutors from benefitting from their illegal conduct, evidence that would have inevitably been discovered through other legal methods should be admitted so that the prosecutor is put in the same position as though the illegality had not occurred. *See Nix v. Williams*, 467 U.S. 431, 442–43, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Under the inevitable discovery doctrine, illegally seized evidence may be admitted if the government proves "by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *United States v. Glenn*, 152 F.3d 1047, 1049 (8th Cir.1998).

Here, the Government argues that at the time of the execution of the warrant at Defendant's residence, law enforcement had information that would have justified a search warrant for any firearms or weapons. The only testimony offered at the hearing, however, was that during the debriefing before executing the search warrant "one of the other officers said that there was some information that the defendant in that premises might have had a gun without a serial number." Hr'g Tr. at 17. Officer Stewart did not provide any testimony supporting a conclusion that the information received by law enforcement in this regard was sufficiently credible to support a search warrant application. More significantly, he provided no testimony that police were actively pursuing an investigation of Defendant for a firearms violation. *See United States v. James*, 353

F.3d 606, 617 (8th Cir.2003) (holding that the inevitable discovery doctrine did not apply where the Government failed to present "evidence of an alternative line of investigation"). Under these circumstances, the Government has failed to carry its burden to show the firearm would inevitably have been discovered. *See Madrid*, 152 F.3d at 1041 ("Whatever balance is to be achieved by the inevitable discovery doctrine, it cannot be that police officers may violate constitutional rights the moment they have probable cause to obtain a search warrant.").

## IV.  CONCLUSION

For the reasons stated herein, Defendant's Motion to Suppress (Clerk's No. 22) is GRANTED. The firearm seized from Defendant's residence on June 19, 2015, and all evidence related thereto, is hereby suppressed.

IT IS SO ORDERED.